840 A.2d 242

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT AND
CROSS–RESPONDENT, v. KENDALL J. JENKINS, DE-
FENDANT–RESPONDENT AND CROSS–APPELLANT.

Argued November 5, 2003—Decided February 4, 2004.

348

352

*Jeanne Screen,* Deputy Attorney General, argued the cause for appellant and cross-respondent (*Peter C. Harvey,* Attorney General of New Jersey, attorney).

*Donald T. Thelander,* Assistant Deputy Public Defender, argued the cause for respondent and cross-appellant (*Yvonne Smith Segars,* Public Defender, attorney; *Stephen P. Hunter,* Assistant Deputy Public Defender, of counsel).

Justice ZAZZALI delivered the opinion of the Court.

This appeal involves two issues. The first is whether the trial court's failure to instruct on lesser-included offenses warrants reversal; the second centers on whether the introduction of evidence of other crimes deprived defendant of a fair trial. Because each inquiry leads us to conclude that defendant is entitled to relief, we affirm the judgment of the Appellate Division and remand the matter for a new trial.

## I.

We summarize the essential facts adduced at trial. On May 8, 2000, Kendall J. Jenkins, later identified as defendant, and some friends were sitting on the porch of an apartment located in the Lexington Courts housing complex in Atlantic City. Arthur Thomas approached defendant and his friends to buy some drugs. After completing the transaction, Thomas began to walk away. At that point, defendant recognized Thomas as the man who had testified against him when he was on trial for the killing of Mark Cotton. Although a jury had acquitted defendant in that proceeding, defendant went after Thomas, picked up a brick, and slammed it into the back of his head. Reeling from the blow, Thomas fell down a flight of stairs and landed headfirst on the concrete below. Autopsy evidence indicated that being struck by the brick likely caused Thomas to lose consciousness, but that he ultimately died from skull and brain injuries resulting from his fall to the pavement.

LaVerne Garland lived in a nearby apartment. As events unfolded, Garland's niece, Adrian Bouldin, apparently yelled for help. Responding to Bouldin's call, Garland stepped out onto her balcony in time to see Thomas fall and defendant run away. She telephoned the police, described what had transpired, and named defendant as the perpetrator. She also informed the police that defendant was still in the area. When Officers Charles Miller and Mary McMenamin arrived, another witness to the attack, Chevon Faulkner, informed the officers that a man had been hit by a brick. The police then found Thomas, dead, in a pool of blood.

Meanwhile, defendant had gone to the apartment of Jane Dunbar, the mother of one of his friends. There, he began playing video games with Dunbar's eleven-year-old son. After the police arrived in response to Garland's call, defendant asked the boy to check whether the officers were still outside. The youth alerted his mother to the police presence. Dunbar went outside and talked to one of the officers and some neighbors, whereupon she learned that defendant allegedly had killed someone. Dunbar

returned to her home and ordered defendant to leave. Shortly thereafter, the police apprehended defendant in another apartment.

Defendant was placed in the county jail. Subsequently, his fellow inmate, Edmond Garland (LaVerne Garland's nephew), contacted the police and informed them that defendant had admitted that after selling drugs to Thomas, he had recognized Thomas as the man who had testified against him, so he "bashed" Thomas in the head. According to Edmond Garland, defendant also stated that after he struck Thomas, one of defendant's friends said, "You've done it again. I don't believe this. You done it again."

LaVerne Garland, Bouldin, and Faulkner also gave formal statements to the police. Before trial, however, three witnesses recanted. Faulkner informed the police that she had made up her story (she had claimed to have seen defendant strike Thomas) so that she could collect a reward. However, she had contacted the police earlier, approximately a month after the killing, stating that she had received threats because of her cooperation in the investigation. Bouldin, in withdrawing her formal statement, claimed that she was under the influence of drugs when she first spoke with the police. Edmond Garland also attempted to retract his statement, apparently after another inmate threatened him. At trial, however, he stood by his original statement to the police.

About six months after the attack on Thomas, LaVerne Garland gave the police a second statement in which she claimed that a person named "Little Ockey" told Garland that her niece, Bouldin, could get hurt or killed if Bouldin did not take back what she had said to the police. LaVerne Garland also told the police that defendant had sent her a letter expressing displeasure with her niece's cooperation in the investigation. But, at trial, Garland recanted everything; she claimed that she had no knowledge of any events relating to the death of Thomas.

Defendant was tried for murder, *N.J.S.A.* 2C:11–3(a)(1) and (2) (Count One); third-degree possession of a weapon for an unlawful purpose, *N.J.S.A.* 2C:39–4(d) (Count Two); fourth-degree unlawful

possession of a weapon, *N.J.S.A.* 2C:39–5(d) (Count Three); and fourth-degree witness retaliation, *N.J.S.A.* 2C:28–5(b) (Count Four). In addition to the various witnesses who directly implicated defendant in Thomas's killing, the prosecution presented evidence indicating that defendant attacked Thomas in retaliation for his testimony against defendant in defendant's trial for the death of Mark Cotton. That evidence included Detective Bruce DeShields's testimony that immediately prior to Cotton's death in 1997, Thomas had seen defendant with a gun and that later Thomas had identified defendant as Cotton's killer from a photographic array. Detective DeShields also stated that Thomas had testified against defendant in that trial, which took place in 1999. Defendant raised no objection to any of that evidence. Defendant did object, however, to the introduction of an excerpted videotape-recording of Thomas's testimony at the Cotton trial. The court overruled the objection and allowed the jury to view the tape.

The prosecutor adduced additional information concerning the killing of Cotton during examination of Bouldin's parole officer, Terry McClain. McClain testified that Bouldin expressed concern to her about testifying against defendant for the killing of Thomas because defendant "had already killed." Making clear the connection with the Cotton trial, the prosecutor then asked, "Does the name Mark Cotton mean anything to you?" McClain responded, "I have heard the name, yes." Again, defendant did not object. Defendant did not testify or present any witnesses.

At the charging conference, defendant argued against instructing the jury on lesser-included offenses pertaining to homicide, preferring to gamble with an all-or-nothing approach on the murder charge. The State countered that the evidence presented at trial necessitated instructions on reckless manslaughter and aggravated manslaughter, as well as murder. The trial court determined that because there was no doubt that defendant struck Thomas either knowingly, purposefully, or intentionally, the facts did not support a charge on any lesser-included homicide offenses. Thus, on Count One, the court instructed the jury only on murder.

The jury returned a verdict of guilty on all counts, including a conviction for first-degree murder. The court merged the weapons offenses into the murder conviction and sentenced defendant to life with thirty years of parole ineligibility. In addition to appropriate fines and penalties, the court imposed a concurrent term of eighteen months on the count of witness retaliation.

On appeal, defendant reversed positions. He argued that, notwithstanding his request at trial, the court erred in failing to instruct on lesser-included offenses of reckless manslaughter and aggravated manslaughter. He also maintained that the court committed reversible error in admitting other-crimes evidence and in failing to offer necessary limiting instructions for evidence that the trial court otherwise properly admitted. The Appellate Division agreed and vacated defendant's convictions. *State v. Jenkins,* 356 *N.J.Super.* 413, 431, 812 *A.*2d 1143, 1154 (2003).

The appellate court found that, based on the evidence presented, a jury could have reasonably concluded that defendant intentionally struck Thomas without being "practically certain" that the attack would kill but, nevertheless, in reckless disregard of the probability or possibility that death might result. *Id.* at 426, 812 *A.*2d at 1151. Accordingly, the trial court had a duty, irrespective of defendant's wishes, to instruct on manslaughter and aggravated manslaughter. *Ibid.* Additionally, the Appellate Division held that the "cumulative effect of the multitude of other crimes evidence admitted at trial without clear and complete limiting instructions deprived defendant of a fair trial." *Id.* at 430, 812 *A.*2d at 1153.

Both parties sought certification. The State requested review of the Appellate Division's decision and a clarification of the circumstances in which a jury must be instructed on manslaughter. Defendant cross-petitioned for certification to preserve the issues not reached by the Appellate Division in the event this Court were to reverse the panel's decision. We granted both petitions for certification, 176 *N.J.* 279, 822 *A.*2d 609 (2003), and now affirm.

## II.

As noted, the Appellate Division vacated defendant's convictions because the trial court erred in failing to instruct the jury on lesser-included offenses of aggravated manslaughter and reckless manslaughter. The State maintains that the panel erroneously disregarded the fact that defendant asked the trial court not to give such an instruction. The State argues that the doctrine of invited error precludes a defendant from taking a position at trial and then, after embracing that approach to his ultimate disadvantage, changing course on appeal and alleging error.

### A.

We first must determine if the error was, in fact, "invited." Specifically, we focus on whether a defendant invites error merely by advocating an erroneous approach or, instead, whether the court actually must rely on the defendant's position in reaching a result.

We have stated that a "defendant cannot beseech and request the trial court to take a certain course of action, and upon adoption by the court, take his chance on the outcome of the trial, and if unfavorable, then condemn the very procedure he sought and urged, claiming it to be error and prejudicial." *State v. Pontery,* 19 *N.J.* 457, 471, 117 *A.*2d 473, 480 (1955). Thus, when a defendant asks the court to take his proffered approach and the court does so, we have held that relief will not be forthcoming on a claim of error by that defendant. On another occasion, we characterized invited error as error that defense counsel has "induced." *State v. Corsaro,* 107 *N.J.* 339, 346, 526 *A.*2d 1046, 1050–51 (1987). However, we have not decided whether actual reliance by the court is necessary to trigger the doctrine.

In addressing that issue, the doctrine of judicial estoppel, a closely related concept that arises in the civil law, provides some guidance. That doctrine "bars a party to a legal proceeding from arguing a position inconsistent with one previously asserted."

*State, Dep't of Law & Pub. Safety v. Gonzalez,* 142 *N.J.* 618, 632, 667 *A.*2d 684, 691 (1995) (internal quotation marks omitted). Judicial estoppel, however, is "an 'extraordinary remedy'" that courts invoke "only 'when a party's inconsistent behavior will otherwise result in a miscarriage of justice.'" *Kimball Int'l, Inc. v. Northfield Metal Prods.,* 334 *N.J.Super.* 596, 608, 760 *A.*2d 794, 800 (App.Div.2000) (quoting *Ryan Operations G.P. v. Santiam–Midwest Lumber Co.,* 81 *F.*3d 355, 365 (3d Cir.1996)), *certif. denied,* 167 *N.J.* 88, 769 *A.*2d 1051 (2001). The doctrine prevents litigants from "playing fast and loose" with, or otherwise manipulating, the judicial process. *Gonzalez, supra,* 142 *N.J.* at 632, 667 *A.*2d at 691. The evil to be avoided is untoward control of the system, leading to inconsistent results. Central to that concern is the principle that a litigant should not be allowed to mislead courts by having one tribunal rely on his or her initial position while a subsequent body is led in a different direction. Thus, it follows that "[t]o be estopped a party must have *convinced the court to accept its position* in the earlier litigation." *Kimball Int'l, Inc., supra,* 334 *N.J.Super.* at 606–07, 760 *A.*2d at 799 (internal quotation marks and alterations omitted) (emphasis added).

 The criminal analog of invited error also is designed to prevent defendants from manipulating the system. Therefore, the invited-error doctrine, like its civil-law counterpart, is implicated only when a defendant in some way has led the court into error. Conversely, when there is no evidence that the court in any way relied on a defendant's position, it cannot be said that a defendant has manipulated the system. Some measure of reliance by the court is necessary for the invited-error doctrine to come into play. *Accord Platt v. U.S.,* 163 *F.*2d 165, 168 (10th Cir.1947) (in forfeiture proceeding invited-error standard not applied when position at trial did not mislead court or "cause it to fall into error").

With those concepts in mind, we now address the trial court's decision not to instruct on lesser-included offenses pertaining to homicide. At the charging conference, defense counsel explained that he believed the facts supported an instruction on manslaugh-

ter, but that his client requested that the court refrain from charging the jury on lesser-included offenses. Although the prosecutor maintained that a conviction for aggravated manslaughter or reckless manslaughter could be returned on the evidence presented and reminded the trial court of its independent duty to make that determination irrespective of defendant's position, the court agreed with defendant.

The court's stated reasons for its decision, however, are revealing. The court acknowledged the obligation to make its own determination whether to instruct on lesser-included offenses. It then made that determination according to its understanding of the law as applied to the facts of this case:

> [F]rankly, I—I don't see how a jury could find that this was reckless conduct. I mean ... the evidence is not in conflict certainly as to what took place here and I— I don't think a reasonable jury could find in any way that if—if this offense was committed by the defendant, he—the offense was committed other than in a purposeful and knowing manner. I mean the victim in this case was—had his, evidently, back to the perpetrator of the crime and there's no way that the jury could find reasonably that the striking of this person was done in anything other than purposeful, knowing, intentional manner.
>
> . . . .
>
> [A]lthough the Prosecutor points out, the Court is—is obligated to charge included offenses whether or not the defendant wants them and the Court does not have to simply accede to the position of the defendant. In this case I think the defendant is—is—he may—he may have his tactical reasons but I think that on the law, his position is correct.

Although the trial court acceded to defendant's request, those comments make clear that the court arrived at the decision not to instruct on lesser-included offenses independently of any invitation or encouragement by defendant. As such, the doctrine of invited error does not apply. However, because defendant did not object to the lack of such an instruction, we will review the decision not to instruct on lesser-included offenses under a plain-error standard.

## B.

In evaluating the decision not to offer instructions on aggravated manslaughter and reckless manslaughter, we first

must determine whether the trial court erred. If it did, defendant's conviction cannot stand if the mistake "was clearly capable of producing an unjust result such that a reasonable doubt is raised as to whether the error led the jury to a result it otherwise might not have reached." *State v. Brims,* 168 *N.J.* 297, 306, 774 *A.*2d 441, 446 (2001) (internal quotation marks and citations omitted). However, because correct jury charges are especially critical in guiding deliberations in criminal matters, improper instructions on material issues are presumed to constitute reversible error. *State v. Jordan,* 147 *N.J.* 409, 421–22, 688 *A.*2d 97, 102–03 (1997).

We have held that a trial court has an independent obligation to instruct on lesser-included charges when the facts adduced at trial clearly indicate that a jury could convict on the lesser while acquitting on the greater offense. *State v. Garron,* 177 *N.J.* 147, 180, 827 *A.*2d 243, 262–63 (2003), *cert. denied,* 72 *U.S.L.W.* 3292, 2004 *WL* 111368 (U.S. Jan. 26, 2004); *State v. Choice,* 98 *N.J.* 295, 299, 486 *A.*2d 833, 835 (1985); *State v. Powell,* 84 *N.J.* 305, 318–19, 419 *A.*2d 406, 413–14 (1980). The present indictment alleges, in Count One, that defendant committed first-degree murder by "purposely or knowingly caus[ing] the death of Arthur Thomas, or . . . [by] purposely or knowingly inflict[ing] serious bodily injury to Arthur Thomas, resulting in his death." Consequently, with murder as the indicted offense, the lesser-included offenses at issue here include aggravated manslaughter and reckless manslaughter.

Murder, as defined by relevant provisions of the New Jersey Code of Criminal Justice (Code), occurs when an actor "purposely . . . [or] knowingly causes the death or serious bodily injury resulting in death. . . ." *N.J.S.A.* 2C:11–3(a). "Criminal homicide constitutes aggravated manslaughter when: The actor recklessly causes death under circumstances manifesting extreme indifference to human life. . . ." *N.J.S.A.* 2C:11–4(a). Finally, the Code provides, in pertinent part: "Criminal homicide constitutes manslaughter when . . . [i]t is committed recklessly. . . ." *N.J.S.A.* 2C:11–4(b).

The trial court apparently looked at the definition of murder and reasoned that because defendant intentionally struck Thomas in the head with a brick and because Thomas died, defendant purposely or knowingly caused serious bodily injury resulting in death. Finding no evidence of anything other than an intentional act that ultimately resulted in death, the court concluded that a jury could not rationally find the existence of mere reckless conduct. In essence, the court determined murder to be the only form of homicide at issue because it concluded that defendant either purposely or knowingly killed the victim or, instead, purposely or knowingly caused serious bodily injury (SBI) resulting in death. Believing that the evidence presented at trial would sustain only a verdict of murder or acquittal, the court refused to instruct the jury on manslaughter.

In *State v. Cruz*, 163 *N.J.* 403, 749 *A.*2d 832 (2000), however, we addressed the differences between the state-of-mind requirement for aggravated manslaughter and the state of mind required for murder premised on the infliction of serious bodily injury, *i.e.*, "SBI murder." We explained that SBI murder involves a higher degree of culpability than does aggravated manslaughter. *Id.* at 417, 749 *A.*2d at 840. Aggravated manslaughter requires the State to prove that "the defendant was *aware of and consciously disregarded* a substantial risk of death, *i.e.*, a *probability that death would result*, and that the defendant manifested extreme indifference to human life." *Ibid.* (emphasis added). However, to obtain a conviction for "purposeful" SBI murder, the State must do more. It must demonstrate that "defendant's *conscious object* [was] to cause serious bodily injury that then resulted in the victim's death" and that defendant "*knew* that the injury created a substantial risk of death and that it was *highly* probable that death would result." *Id.* at 417–18, 749 *A.*2d at 840 (emphasis added). Similarly, to prove "knowing" SBI murder, the State must make the same showing, except that, rather than proving that serious bodily injury was defendant's conscious objective, it need only demonstrate that he "was *aware that it was*

*practically certain* that his conduct would cause serious bodily injury." *Id.* at 418, 749 *A.*2d at 840 (emphasis added).

Thus, the following key distinctions emerge. To be guilty of SBI murder, the defendant must have knowingly or purposely inflicted serious bodily injury with *actual knowledge* that the injury created a substantial risk of death and that it was "*highly* probable" that death would result. In aggravated manslaughter, by contrast, the defendant must have caused death with an "awareness and conscious *disregard* of the *probability* of death." If, instead, the defendant *disregarded* only a "*possibility*" of death, the result is reckless manslaughter. *State v. Breakiron,* 108 *N.J.* 591, 605, 532 *A.*2d 199, 206 (1987); *State v. Pearson,* 318 *N.J.Super.* 123, 136, 723 *A.*2d 84, 90 (App.Div.1999).

At trial, the State presented evidence indicating that, in retaliation for Thomas's testifying against defendant in a previous murder trial, defendant struck him in the head with a brick. That caused Thomas to fall down a flight of stairs and plummet headfirst to the pavement below. The pivotal question, therefore, becomes whether the jury could have concluded that defendant hit the victim without conscious knowledge that death was a high probability but, instead, with reckless disregard of the possibility or probability that death would occur. Without passing on the credibility of the evidence itself, we agree with the Appellate Division that a jury might have so concluded.

The trial court focused on the purposeful, knowing, and intentional nature of defendant's alleged striking of the victim. Instead, the proper inquiry in distinguishing murder from the two degrees of manslaughter relates to defendant's state of mind as to the risk of death. A jury could have concluded that defendant struck Thomas in order to kill him or with knowledge that death was certain or highly probable. However, the facts indicate that the jurors also could have rationally concluded that defendant struck the victim not knowing that serious bodily injury would result in the victim's death, or not knowing that the injury created a substantial risk of death and that it was highly probable that

death would result. That is, the jurors could have found that defendant consciously disregarded a known risk that created the possibility or probability that death would follow from his conduct.

The expert testimony indicating that it was not defendant's blow but rather the subsequent fall to the pavement that caused Thomas's death provides significant support for that conclusion inasmuch as the jury need not have concluded that defendant struck Thomas intending or knowing that the blow would cause him to fall down the stairs. That being the case, the trial court was obligated to instruct on manslaughter and aggravated manslaughter as well as murder. As the Appellate Division held, the failure to do so constitutes reversible error warranting a new trial.

### III.

The Appellate Division also vacated defendant's convictions on the separate ground that the trial court erred in admitting other-crimes evidence without adequate limiting instructions. Although defendant objected only to the admission of the videotape of Thomas's prior testimony at the Cotton trial, the appellate panel concluded that "the cumulative effect of the multitude of other crimes evidence admitted at trial without clear and complete limiting instructions deprived defendant of a fair trial." *Jenkins, supra,* 356 *N.J.Super.* at 430, 812 *A.*2d at 1153. We already have determined that defendant is entitled to a new trial; however, we treat the other-crimes issues at length because they are likely to resurface on remand.

The State maintains that all of the evidence relating to defendant's alleged killing of Cotton, including Thomas's videotaped testimony, was relevant both to demonstrate motive for the attack on Thomas and as a necessary element for the count of witness retaliation. The trial court allowed the jury to hear an approximately two-minute excerpt of Thomas's testimony at the Cotton trial. In that video, Thomas describes how he happened to witness defendant waving a gun. Thomas next explains that he

heard a "bang" and then saw defendant running away from the area in which he apparently fired the weapon.

The Appellate Division upheld the trial court's decision to admit the videotape, finding it "highly relevant and not unduly prejudicial to warrant exclusion." *Jenkins, supra,* 356 *N.J.Super.* at 430, 812 *A.*2d at 1153. The appellate panel determined, however, that the limiting instructions concerning the videotape were insufficient. *Ibid.* We agree that the trial court erred in not providing adequate limiting instructions. But we also find that, as a threshold matter, the trial court erred in admitting the tape. In combination with the additional other-crimes evidence presented to the jury, the admission of the tape amounted to reversible error.

Our rules of evidence provide that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that he acted in conformity therewith." *N.J.R.E.* 404(b). But, "[s]uch evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute." *Ibid.* We further qualify the admission of such evidence by the requirement that the apparent prejudice of such testimony must not outweigh its probative value. *State v. Long,* 173 *N.J.* 138, 162, 801 *A.*2d 221, 235–36 (2002). It is true that when motive or intent is at issue, we "generally admit a wider range of evidence." *State v. Covell,* 157 *N.J.* 554, 565, 725 *A.*2d 675, 681 (1999). Nevertheless, in deciding whether prejudice outweighs probative value, "a court must consider the availability of other evidence that can be used to prove the same point." *Long, supra,* 173 *N.J.* at 164, 801 *A.*2d at 237 (internal quotation marks omitted).

Although the State was entitled to show that defendant harbored a grudge against Thomas for the latter's role in accusing defendant of killing Mark Cotton, the critical question concerns the extent and character of the evidence that the trial court should

have allowed to demonstrate motive in these circumstances. Here, Thomas's testimony and conduct in the Cotton matter exposed defendant to the very real possibility of life in prison. It is thus fairly inferable from the record that the prospect of extended incarceration enraged defendant, causing him to retaliate against Thomas. However, because it appears that the penological consequences of the accusation fueled the fires of revenge, the specific charge of murder in the previous trial is less relevant.

■ More important, less prejudicial evidence exists to prove motive in these circumstances. The State can demonstrate defendant's desire for revenge by making the jury aware that Thomas's testimony against defendant occurred in a trial for a first-degree crime that exposed defendant to a possible sentence of life imprisonment. But because the present trial involved an accusation of another murder, the trial court erred in allowing the jury to hear that defendant previously stood trial for the murder of Mark Cotton. The risk was too high that upon hearing that fact, at least some of the jurors concluded that defendant was prone to kill.

■ As described above, the videotape portrayed an excerpt of Thomas's testimony at the Cotton trial. Thomas's description of the events—specifically, that he saw defendant waving a gun, heard a shot, and then saw defendant running away— required little speculation by the jury to conclude that defendant stood trial for Cotton's murder. For the reasons already explained, informing the jury that defendant had once been accused of another unrelated killing ran a grave risk that at least some of the jurors would determine defendant had a propensity to kill. And as also discussed above, beyond the incarceration to which Thomas's actions exposed defendant, the specific facts of the first trial have little, if any, probative value. Accordingly, the trial court erred in admitting the tape in evidence. Viewing that error in conjunction with the additional other-crimes evidence presented to the jury compels us to conclude that a new trial is necessary.

That additional evidence consisted of testimony by Sergeant DeShields, Edmond Garland, and parole officer McClain. Each offered testimony concerning defendant's alleged killing of Cotton. Although defendant failed to object to that testimony at trial, allowing the jury to hear other-crimes evidence concerning defendant's alleged killing of Cotton, in combination with the videotaped testimony, prejudiced defendant. Collectively, that evidence impaired the jury's ability to objectively determine guilt or innocence.

Sergeant DeShields testified that Thomas had identified defendant as Cotton's killer and that Thomas subsequently testified against defendant in his trial for murder. As explained above, the prejudice that inheres in introducing the previous "murder" charge outweighs the probative value relating to motive. Sergeant DeShields's comments, insofar as they were necessary to establish that Thomas accused defendant, should have been limited to conveying that Thomas identified defendant as the perpetrator of a first-degree crime and then testified against defendant at a trial that exposed him to a possible sentence of life in prison.

Similar error occurred during Edmond Garland's testimony. He testified that he was housed with defendant while the two were confined in county prison. Having known Garland since childhood, defendant apparently took him into his confidence. He told Garland how, after selling Thomas some drugs, defendant recognized Thomas as the man who had testified against him in the Cotton affair. Therefore, to gain revenge, defendant "bashed" Thomas in the head. Defendant allegedly informed Garland that immediately after the assault, one of defendant's friends, Al Sharif, said to defendant, "You've done it again. I don't believe this. You done it again." Garland, in turn, related this entire story to the jury.

Defendant's admissions to Garland were properly presented to the jury. However, there was no valid basis for allowing the hearsay relating to Al Sharif, even though defendant voiced no objection to that statement. *N.J.R.E.* 802; *N.J.R.E.* 803(b). The

comment by one of his friends that defendant had "done it again," said twice, almost certainly prejudiced defendant in the eyes of the jury. It impermissibly raised the specter that defendant, despite being acquitted in the prior trial, had committed a similar bad act on a prior occasion and was inclined to kill again.

Parole officer McClain's hearsay testimony also improperly imported other-crimes evidence from the Cotton affair. She told the jury that Bouldin, while she was her client on parole, informed her that she feared testifying against defendant because defendant "had already killed." In light of the conflicting stories Bouldin had given to the police, such an out-of-court statement had relevance in explaining any inconsistencies in her testimony. Although otherwise admissible to explain Bouldin's conduct, *N.J.R.E.* 803(c)(3), in the context of this trial the risk of prejudice posed by the statement's explicit reference to another killing outweighed its probative value. *N.J.R.E.* 403. However, if Bouldin's retraction of her formal statement becomes an issue on remand, the trial court, in its discretion, may allow properly redacted out-of-court statements made by Bouldin that indicate that she feared defendant because she believed him to be violent. To the extent such testimony suggests evidence of other-crimes, it will then be necessary to instruct the jury on its proper use and to inform the jurors that they may not infer from that evidence that defendant had a propensity for violence.

In view of defendant's lack of proper and timely objections to the above testimony, we hesitate to fault the trial court. We also realize that we have parsed rather finely the testimony in this case. Further, we are not unmindful of the serious charges against defendant, ranging from witness retaliation to murder. Nonetheless, our ruling accords the State ample latitude to demonstrate motive in this case. At the new trial, the State may present evidence that the victim, Thomas, in a previous and unrelated matter, identified defendant as the perpetrator of a first-degree crime and testified against defendant at a trial that exposed defendant to a possible sentence of life in prison. However,

allowing the jury to view Thomas's videotaped testimony, in combination with the additional other-crimes evidence presented by the State, simply created too great a risk that some of the jurors concluded defendant had a propensity to kill. In those circumstances, defendant was denied a fair trial.

## IV.

In view of our decision to grant a new trial, we need not reach defendant's other claims of error. Therefore, and in all other respects, we affirm the judgment of the Appellate Division.

Justice VERNIERO, concurring and dissenting.

I join the Court in reversing defendant's conviction and concur in all but one narrow aspect of its opinion. Regarding defendant's retrial, I would permit the State to play the videotaped excerpt of Arthur Thomas's testimony from defendant's previous murder trial. In a real sense, that testimony constitutes the entire reason that defendant allegedly attacked Thomas. From that perspective it is highly relevant, highly probative evidence that should be admitted consistent with *N.J.R.E.* 403 and 404(b).

The tape presents Thomas testifying that he observed defendant waive a gun, that he heard a "bang," and that he then saw defendant run from the scene. It does not contain the word "murder" or offer any opinion on defendant's alleged guilt, and it runs less than two minutes in length. Given that the State's theory concerning defendant's motive focuses almost completely on the testimony captured on that tape, I find no adequate substitute for playing it before the jury. If defendant's retrial is to be a search for the truth, then the jury should not be blindfolded but instead should be permitted to see the alleged victim exactly as defendant saw him, namely, as an adverse witness at the prior proceeding.

In view of the foregoing, I agree completely with the succinct analysis articulated by Judge (now Justice) Wallace, who stated on behalf of the unanimous Appellate Division panel in this case:

> Here, the evidence that Thomas testified against defendant at a prior trial was offered to prove an element of the "retaliation against a witness" charge and to establish a motive for the murder charge. *The motive evidence was highly relevant in this case.* "A wider range of evidence is admissible to establish motive or intent than is permitted in support of other issues." *State v. Crumb,* 277 *N.J.Super.* 311, 317, 649 *A.*2d 879[, 882] (App.Div.1994).[T]he trial court permitted, over defendant's objection, the playing of a videotaped excerpt of Thomas's testimony at the prior murder trial which identified defendant as the suspect and cautioned the jury that the evidence was not being admitted for the truth of what Thomas testified, but merely to prove that he was a witness against defendant.
>
> We are satisfied that the trial court did not abuse its discretion in admitting this evidence. Whether under a Rule 404(b) analysis, or a Rule 403 analysis, the evidence was highly relevant and not unduly prejudicial to warrant exclusion. Although not requested to do so, we are convinced that if the court had been requested to undertake a 404(b) analysis, the court would have found the other crimes evidence of Thomas's testimony against defendant satisfied the four-prong [test under *State v. Cofield,* 127 *N.J.* 328, 338, 605 *A.*2d 230[, 235] (1992)].
>
> [*State v. Jenkins,* 356 *N.J.Super.* 413, 429–30, 812 *A.*2d 1143, 1153 (2003).]

In sum, the videotape is critical for the purpose of explaining defendant's alleged motive. The tape, which we viewed as part of the record, shows Thomas placidly testifying to what he had observed without any trace of emotionalism. I am not convinced that its brief playing, within the context of a whole trial, would be "so inflammatory as to distract the jurors from performing their jobs fairly and in a deliberate fashion." *State v. Koskovich,* 168 *N.J.* 448, 487, 776 *A.*2d 144, 166 (2001). To the contrary, excluding it will prevent the jury from considering evidence that is highly probative, highly relevant, and unique. Accordingly, I would permit jurors at defendant's retrial to see and hear the videotape with an appropriate limiting instruction, and I respectfully dissent from the majority's contrary conclusion.

*For affirming*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, and ALBIN—5.

*Concurring in part/dissenting in part*—Justice VERNIERO—1.