**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0981-21

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

HAROLD K. COLBERT,
a/k/a ABDUL COLBERT,
and KAREEM JONES,

     Defendant-Appellant.

_____

Argued October 3, 2023 – Decided January 9, 2024

Before Judges Sumners, Rose and Perez Friscia.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 19-03-0612.

Tamar Yael Lerer, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Tamar Yael Lerer, of counsel and on the briefs).

Emily M. M. Pirro, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Theodore N. Stephens, II, Acting Essex

County Prosecutor, attorney; Emily M. M. Pirro, of counsel and on the brief).

PER CURIAM

In the early morning hours of November 1, 2018, Daquan Cuttino was shot to death outside a Newark residence. The State's prosecution of defendant Harold Colbert for the murder was based primarily on testimony of the victim's girlfriend, the only known eyewitness, identifying defendant as the shooter. A jury found defendant guilty of first-degree murder, N.J.S.A. 2C:11-3(a)(1); second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1); and second-degree possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1). Defendant was sentenced to an aggregate prison term of forty-five years, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2.

Before us, defendant argues:

POINT I

ERRORS WITH THE IDENTIFICATION PROCEDURE, TESTIMONY, AND JURY CHARGE REQUIRE REVERSAL OF DEFENDANT'S CONVICTIONS. (Partially Raised Below).

A. Because The State Failed To Make An Appropriate Record Of The Identifications And A Hearing On The Issue Was Inappropriately Denied, Defendant Was Deprived Of A Fair Trial.

2 <span>A-0981-21</span>

B. Because The State Failed To Ask The Eyewitness Her Confidence At The Time Of The Identifications, She Should Not Have Been Allowed To Testify To Her Confidence Retrospectively At Trial.

C. The Failure To Provide The Jury With The Requested, Tailored Identification Charge Requires Reversal of Defendant's Convictions.

POINT II

THE ASSERTION THAT THE NEW JERSEY STATE POLICE HAD FAILED TO FIND A PERMIT FOR DEFENDANT TO POSSESS A WEAPON WAS INADMISSIBLE HEARSAY. ITS ERRONEOUS ADMISSION REQUIRES REVERSAL OF ALL CHARGES. (Not Raised Below).

POINT III

THE PROSECUTOR ENGAGED IN REVERSIBLE MISCONDUCT WHEN HE TOLD THEY JURY IT HAD A DUTY TO CONVICT AND INVOKED THE NUREMBERG TRIALS. (Not Raised Below).

POINT IV

THE FAILURE TO PLAY THE MAIN WITNESS'S CROSS-EXAMINATION ALONG WITH THE DIRECT TESTIMONY, AS WELL AS THE FAILURE TO ISSUE ANY INSTRUCTION ON HOW TO CONSIDER THE DIRECT TESTIMONY THAT WAS PLAYED BACK, REQUIRES REVERSAL. (Not Raised Below).

POINT V

A-0981-21

EVEN IF ANY ONE OF THE COMPLAINED-OF ERRORS WOULD BE INSUFFICIENT TO WARRANT REVERSAL, THE CUMULATIVE EFFECT OF THOSE ERRORS WAS TO DENY DEFENDANT DUE PROCESS AND A FAIR TRIAL.

POINT VI

THE TRIAL COURT INAPPROPRIATELY CONSIDERED DEFENDANT'S SUPPRESSED STATEMENT, ERRED IN ITS ANALYSIS OF AGGRAVATING FACTOR SIX, AND FAILED TO CONSIDER THE IMPACT OF DEFENDANT'S ADVANCED AGE AT RELEASE ON THE APPROPRIATE SENTENCE. THE SENTENCE MUST BE VACATED AND THE MATTER REMANDED FOR A RESENTENCING.

We reject the arguments that the trial court erred in admitting testimony and instructing the jury regarding eyewitness out-of-court identification of defendant. We, however, reverse defendant's convictions because we conclude inadmissible hearsay testimony was allowed to prove defendant's lack of a firearm permit and the prosecutor's misconduct denied defendant a fair trial. Considering a new trial is warranted, we do not address defendant's arguments regarding replay of the eyewitness's cross-examination, cumulative error, or sentence.

I.

4

To provide context to the issues raised on appeal, we briefly summarize the trial testimony and procedural history.

A. Shooting

On November 1, 2018, sometime between midnight and 1:00 a.m., Cuttino asked his live-in girlfriend, Whitney Allen, to drive him to "18th and 18th," in Newark, a place she had been to "[c]ountless" times before. After Allen parked on the one-way street in front of a house, Cuttino got out, walked up to the house's porch, and knocked on the door. A man she knew only by his nickname "Sleep," whom she later identified as defendant, came out. Before that night, she had seen Sleep, always at that same house during daylight hours, "more than five times" during the approximately one year she dated Cuttino. Her interaction with Sleep was limited to "hi and bye" greetings with no conversation. Allen testified it was "bright enough" on the street for her to see that night; in her statement to law enforcement later that day, she stated it was "not super bright" but there were streetlights.

Allen initially saw Cuttino and Sleep talking and laughing, which then turned to "arguing, and . . . fighting," causing them to move off the porch next to a car parked in front of her car. Cuttino punched Sleep two times and then Sleep "pulled out [a] gun." Allen could not recall or did not see where the gun

5

A-0981-21

came from. She testified Cuttino "ended up running and Sleep pursued him. . . . And he shot him. He killed [Cuttino]," then ran away. Allen also testified that Sleep fired the gun "so many" times and it was "continuous." Allen drove her car to the middle of the street and got out to attend to Cuttino, who was unresponsive.

B. Identification of Defendant & Lack of a Permit to Carry a Firearm

Felipe Ramirez and Rashon Greene of the Newark Police Department were the first law enforcement officers to arrive at the scene. While Ramirez aided Cuttino, Greene spoke to Allen, who was "very distressed," "crying," "screaming," and "say[ing] multiple things." Ramirez stated that Allen was screaming, "He did it. He did it. I know who it is" and "mentioned somebody" named Sleep.

Sergeant Taray Tucker and Detective Salvatore Cordi of the Essex County Prosecutor's Office (ECPO) Homicide Task Force subsequently arrived at the scene to assist. Tucker testified that surveillance video in the area gave no close-up of the shooter. He described the lighting at the South 18th Street crime scene that night as "pretty fair," illuminated by streetlights and the intersection was "well-lit." Tucker also stated that, based on his investigation, defendant was arrested and an "inquiry was made" as to whether he had ever received a permit

6

to purchase or carry a firearm in New Jersey. "A determination was made" that he was "not authorized to carry—or permitted to carry a firearm."

Later in the morning following the shooting, Allen went to the ECPO and showed Cordi a photograph of Cuttino and Sleep together which she found on Cuttino's phone. Allen took the photograph to show the detectives "that [it] was [Sleep] that did it," meaning Sleep killed Cuttino.

Later that same day, Allen formally identified Sleep as defendant in a "six-pack" photo-array organized by ECPO Detective Daniel Villanueva, who was not involved in the investigation. Allen identified photo three, defendant's photo as "Sleep . . . who killed my boyfriend Daquan Cuttino." Defendant's pretrial motion to suppress Allen's out-of-court identification was denied.

Allen testified at trial she was "sure" of her identification of Sleep from the photo array without any doubt. Moreover, she pointed out to the jury that Sleep, the person who killed Cuttino, was defendant.

FBI Special Agent John Hauger testified as an expert in the field of historical cellular telephone data analysis. Asked to track defendant's cell phone number through records obtained from a communications data warrant, Hauger testified that phone calls from that number between 10:57 p.m. on October 31, 2018, and 1:17 a.m. November 1, 2018, were placed while the phone was near

7

649 South 18th Street in Newark. Phone calls starting at 1:24 a.m. and 1:44 a.m. were made while the phone was moving southwest from that area. A final call at 1:50 a.m. was made further southwest, somewhere in the area of Stuyvesant Avenue and Lyons Avenue. Hauger agreed on cross-examination that the phone calls could have been made from anywhere in the square-mile sector noted on the maps the police provided, not necessarily at the South 18th Street location, where Cuttino was shot.

II.

Initially, we address defendant's arguments that his rights to due process and a fair trial were violated by the trial court's denial of his motion to suppress Allen's out-of-court identifications of him and its erroneous jury charge on identification.

A. Motion to Suppress Identifications

Defendant moved for a "limited hearing . . . for counsel to explore whether . . . Allen discussed her identification with any private actors prior to selecting [defendant's Facebook] photo." He also argued Allen's identification reviewing the photo array was erroneous because detectives "failed to ask critical and mandatory questions, such that the record made was inadequate."

8

The trial court rejected defendant's contention the detectives erred in not following the requirements set forth in State v. Henderson[1] and Rule 3:11 that they ask Allen whether she discussed the Facebook photo identification with anyone else. The court ruled there was no error because there was no evidence of the suggestion cautioned by Henderson could lead to Allen's mistaken identification of defendant. The court pointed to the fact that Allen stated she was "familiar with" defendant, having met him over the summer and saw him "several times." The court stressed it was Allen who presented defendant's Facebook photo to the detectives, which "they use[d] . . . as a basis for a photo array that otherwise fully comports with Delgado,[2] Henderson, everything, but for a question about any private actors—you know—influenc[ing] [Allen's] identification here."

In his appeal, defendant contends we should reverse his convictions because the trial court erred in allowing testimony concerning Allen's: "unrecorded identification of Sleep as the shooter when Allen brought a [Facebook] picture to the police station;" and "the recorded identification of

---

[1]  208 N.J. 208 (2011).

[2]  State v. Delgado, 188 N.J. 48 (2006).

[defendant] from the array as both Sleep and the shooter." Alternatively, he seeks remand for a Wade[3]/Henderson hearing. In addition, defendant contends the trial court erred in "failing to give the requested tailored identification instruction" as to defendant's contention that "familiarity does not guarantee reliability."

We review the denial of a Wade/Henderson identification hearing for abuse of discretion. State v. Ortiz, 203 N.J. Super. 518, 522 (App. Div. 1985). We uphold a trial judge's admission of an out-of-court identification if "the findings made could reasonably have been reached on sufficient credible evidence present in the record." State v. Wright, 444 N.J. Super. 347, 356 (App. Div. 2016) (quoting State v. Johnson, 42 N.J. 146, 162 (1964)). To obtain a Wade hearing, a defendant must "proffer . . . some evidence of impermissible suggestiveness" which could lead to an erroneous identification. Henderson, 208 N.J. at 239, 288 (alteration in original) (citations omitted).[4] If a defendant presents sufficient evidence of impermissible suggestiveness, the court should

---

[3] United States v. Wade, 388 U.S. 218 (1967).

[4] Our Supreme Court subsequently modified Henderson in part, adding where "no electronic or contemporaneous, verbatim written recording of the identification procedure is prepared" defendants are entitled to a Wade hearing. State v. Anthony, 237 N.J. 213, 233 (2019). Anthony does not change our analysis because Allen's identification was recorded.

conduct an evidentiary hearing where the State must offer proof the proffered eyewitness identification is reliable based several variables. Id. at 288-89.

A Wade/Henderson hearing is not required for a "confirmatory" identification because such an identification is "not considered suggestive." State v. Pressley, 232 N.J. 587, 592 (2018). "A confirmatory identification occurs when a witness identifies someone he or she knows from before but cannot identify by name." Id. at 592-93. The Court explained the person identified "may be a neighbor or someone known only by a street name." Id. at 593. That is what occurred here. Allen had seen "Sleep" before and identified him from the photo on Cuttino's Facebook page. This was a confirmatory identification. Therefore, a Wade hearing was not required. Id. at 592. Accordingly, denying defendant's request for a Wade hearing was not an abuse of discretion.

Turning to Allen's out-of-court identification of defendant, our court rules detail the procedures law enforcement must follow for the identification to be admitted at trial. Rule 3:11(c)(9) requires a recording of "a witness' statement of confidence, in the witness' own words, once an identification has been made." Rule 3:11(c)(10) requires the recording of "the identity of any individuals with whom the witness has spoken about the identification procedure, at any time

before, during, or after the official identification procedure, and a detailed summary of what was said." We conclude Allen's photo array identification of defendant was not tainted by the detectives' failure to adhere to these requirements.

Allen unexpectedly, and voluntarily, presented the Facebook photo to law enforcement to show who killed her boyfriend. They did not direct, nor did Allen indicate, she would go home to get a photo of the shooter, Sleep. The record demonstrates Allen told police she looked through Cuttino's Facebook account to find the photo. In the photo were Allen, Cuttino, and Sleep; she drew an arrow to Sleep on the picture at the request of the detective. Defendant has not cited, nor are we aware of, any authority supporting his claim indicating that the recording requirements of Rule 3:11 apply to circumstances such as here, where a witness, unprompted, provides police with a photo claiming it shows the perpetrator of a crime.

Law enforcement substantially complied with Rule 3:11(c)(9) and (10). After Allen provided the Facebook photo, a detective, who was not involved in the investigation or the Facebook identification, recorded Allen's review of the photo array and follow-up questioning about both the photo she had selected from the array and the Facebook photo. When asked if she were "absolutely

certain" the person in the photo—defendant known to her as Sleep—was the shooter, she said "[y]es." She also stated there was no doubt in her mind that Sleep was the shooter, and no one forced or threatened her to identify him.

B. Identification Jury Charge

Defendant argues he was deprived of a fair trial by the trial court's refusal to include "the role of familiarity and of unconscious transference" in the jury instruction on identification. Defendant sought jury charge identification language that was not included in the model charge based on Henderson:

> Research has shown that mere familiarity with a defendant does not increase the reliability of an identification unless there is evidence that the person identified is a family member, friend, or longtime acquaintance of the witness.
>
> In assessing this identification[,] you should consider the degree of familiarity between the defendant and the eyewitness. Lesser degrees of familiarity do not enhance accuracy and may, in fact, decrease accuracy of the identification.

Defense counsel advised the court the proposed language was "pieced together through research regarding other states' instructions relating to identification. And . . . there was an appearance in the Henderson Special Master report that related to familiarity." Counsel also cited "several studies that show that a marginal level of familiarity with a suspect does not . . . increase

the reliability of an identification." Counsel noted Allen testified that her "encounters" with defendant were "just in passing" and she argued the "minimal level of familiarity" was "really important here." Counsel also noted that it was "just a warning akin to the confidence level" of the identification and that "the research shows it's not actually a predictor of accuracy;" "[m]inimal familiarity does not increase the reliability of an identification." The State objected, arguing the requested language was not in the model jury charge and it "flies in the face of common sense."

The trial court, relying on Henderson's recognition that "the lynch pin here for inclusion within the [identification] charge is general acceptance within the scientific community," denied defendant's request. The court reasoned defense counsel made an insufficient showing that there's generally accepted scientific research to support the recommended language. The court further determined Allen's identification of defendant was a "confirmatory identification," "which is not considered suggestive" under Pressley. The court thus issued an identification instruction that generally tracked the language in the Modern Jury Charges (Criminal), "Identification: In-Court and Out-Of-Court Identifications" (rev. May 18, 2020).

"Appropriate and proper jury instructions are essential to a fair trial." State v. McKinney, 223 N.J. 475, 495 (2015) (quoting State v. Green, 86 N.J. 281, 287 (1981)). "[J]ury charges 'must outline the function of the jury, set forth the issues, correctly state the applicable law in understandable language, and plainly spell out how the jury should apply the legal principles to the facts as it may find them.'" Prioleau v. Ky. Fried Chicken, Inc., 223 N.J. 245, 256 (2015) (quoting Velazquez v. Portadin, 163 N.J. 677, 688 (2000)). "Erroneous instructions are poor candidates for rehabilitation as harmless, and are ordinarily presumed to be reversible error." State v. Afanador, 151 N.J. 41, 54 (1997) (citing State v. Brown, 138 N.J. 481, 522 (1994)).

"Appellate courts apply a harmless error analysis when a defendant has objected to a jury charge." State v. Berry, 471 N.J. Super. 76, 105 (App. Div. 2022) (citing State v. Jenkins, 178 N.J. 347, 361 (2004)); see also R. 2:10-2. "Under that standard, there must be some degree of possibility that [the error] led to an unjust result. The possibility must be real, one sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached." Id. at 105-06 (alterations in original) (quoting State v. Baum, 224 N.J. 147, 159 (2016) (quoting State v. Lazo, 209 N.J. 9, 26 (2012))). The reviewing court must first "determine whether the trial court erred." Jenkins,

178 N.J. at 361. If error occurred, "defendant's conviction cannot stand if the mistake 'was clearly capable of producing an unjust result such that a reasonable doubt is raised as to whether the error led the jury to a result it otherwise might not have reached.'" Ibid. (quoting State v. Brims, 168 N.J. 297, 306 (2001)).

"Model jury charges are often helpful to trial judges in performing the important function of charging a jury." State v. Cotto, 471 N.J. Super. 489, 543 (App. Div.) (citing State v. Concepcion, 111 N.J. 373, 379 (1988)), certif. denied, 252 N.J. 166 (2022). Thus, "a jury charge is presumed to be proper when it tracks the model jury charge because the process to adopt model jury charges is 'comprehensive and thorough.'" Ibid. (quoting State v. R.B., 183 N.J. 308, 325 (2005)). Although our Supreme Court has held that "the better practice is to mold the instruction in a manner that explains the law to the jury in the context of the material facts of the case[,]" Concepcion, 111 N.J. at 379, failure to do so does not support defendant's arguments for the additional instruction he sought below.

With these principles in mind, we conclude substantially for the reasons expressed by the trial court that there was no error in rejecting defendant's proposed language. Considering the comprehensive identification instruction issued largely tracked the model charge, which is based on Henderson, and the

absence of any testimonial evidence to support defendant's application, no injustice resulted in the identification charge provided by the court.  See R. 2:10-2.

### III.

Defendant argues the trial court violated his rights under the Confrontation Clause by allowing inadmissible hearsay testimony to prove defendant did not possess a permit to carry a firearm in this state.  Sgt. Tucker testified, without objection, that based upon an "inquiry made to the New Jersey State Police[,]" which maintains the state's firearm permit records, defendant did not possess a permit to carry a firearm in New Jersey.

Defendant contends the lack of admissible evidence regarding defendant possession of a firearm permit was compounded by the prosecutor's summation remarks:

> Defendant was armed that morning.  He had no right to be carrying a firearm.  He had no permit for it.  He had no permit to purchase the weapon and he had, more importantly, no permit to carry it.  But yet he was armed.  He was armed with a semi-automatic handgun. And we know he had at least eleven rounds in that weapon.  How do we know that?  Eleven shell casings. And they all came from one gun.  One gun and one gun only.

Defendant contends the error requires reversal of all his convictions, not just his conviction for second-degree unlawful possession of a handgun.

Because defendant failed to object to Tucker's testimony, "we analyze his claim . . . through the lens of plain error review," State v. Ross, 229 N.J. 389, 408 (2017), and we will reverse only if it was "clearly capable of producing an unjust result," R. 2:10-2.  "The mere possibility of an unjust result is not enough."  State v. Funderburg, 225 N.J. 66, 79 (2016).  To reverse, the error "must be sufficient to raise 'a reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not have reached.'"  Ibid. (alteration in original) (quoting Jenkins, 178 N.J. at 361).

There is no doubt Tucker's testimony that defendant did not possess a permit to carry a firearm was hearsay.  His testimony was "offer[ed] in evidence to prove the truth of the matter asserted"— that defendant was guilty of second-degree unlawful possession of a handgun.  See N.J.R.E. 801(c)(2).  His testimony was not based on his personal knowledge, but on information he had obtained from a non-testifying witness who had searched the State Police firearms database.  In opposition, the State has not presented any argument that Tucker's testimony is admissible as a hearsay exception under our Rules of Evidence.  The State did not introduce any documentary evidence of the firearms

database search, and none of the hearsay exceptions relating to records apply. Cf. N.J.R.E. 803(c)(6) (records of regularly conducted activity, i.e., business records); N.J.R.E. 803(c)(8) (public records, reports, and findings); N.J.R.E. 803(c)(10) (certification of absence of public record or statement); see also N.J.R.E. 902(a) (self-authentication of New Jersey public documents); N.J.R.E. 902(k) (self-authentication of a certification of lack of official record).

This situation is akin to that in State v. Martini, where the State offered testimony like that offered by Tucker to support a conviction for second-degree unlawful possession of a handgun. 131 N.J. 176, 319 (1993). An investigating officer testified that he had "contacted the New Jersey State Police" to "check to see if [the defendant] had a permit to carry a gun in the State of New Jersey[,]" and "found that he did not." Ibid. This was "[t]he only evidence the State offered" to convict defendant of the handgun offense. Ibid. As our Supreme Court held, "[i]n order to prove the absence of an entry in State Police files under [former New Jersey] Evidence Rule 63(14) (the business record exception to hearsay), a witness with personal knowledge of those files must testify." Id. at 320. Because no testimony by a witness with personal knowledge had been proffered, the Court reversed Martini's conviction of unlawful possession of a handgun. Ibid.

Here, as in Martini, the State proffered no testimony by any witness with personal knowledge of the search of the State Police firearms database. Thus, we reverse defendant's conviction for second-degree unlawful possession of a handgun because the only evidence supporting that conviction was the inadmissible hearsay testimony by Tucker.

As for defendant's claim that Tucker's testimony also warrants reversal of the remaining offenses, we disagree. The prosecutor's limited reference to the lack of a permit did not "substantially prejudice[]" the jury's ability to "evaluate the merits" of defendant's defenses to the other offenses, or have the "clear capacity to bring about an unjust result." State v. Johnson, 31 N.J. 489, 510 (1960). Defendant's lack of a firearm permit did not bolster the State's proofs that defendant committed murder, nor did the prosecutor make that argument.

Defendant also raises a Confrontation Clause argument based primarily on State v. Carrion, 249 N.J. 253 (2021). In Carrion, decided six weeks after defendant was sentenced, the Court held the defendant's Confrontation Clause rights were violated when the trial court admitted "an affidavit attesting to [the defendant's lack of a firearm permit which was] created after a search of the firearm registry database." Id. at 271-72. The affidavit was "testimonial" and as the sole evidence proffered to prove the defendant was unlicensed, "the

officer knowledgeable about how the search of the database was performed" could not be questioned.  Id. at 272.

Because we reverse defendant's conviction for unlawful possession of a handgun due to the admission of inadmissible hearsay, we need not address his Confrontation Clause argument as well as the question of Carrion's retroactivity. See Comm. to Recall Robert Menendez from the Off. of U.S. Senator v. Wells, 204 N.J. 79, 95 (2010) (stating that courts "strive to avoid reaching constitutional questions unless required to do so"); Randolph Town Ctr., L.P. v. County of Morris, 186 N.J. 78, 80 (2006) ("Courts should not reach a constitutional question unless its resolution is imperative to the disposition of litigation.").

IV.

For the first time on appeal, defendant contends the prosecutor's improper summation comments require a new trial.  Defendant challenges the following remarks:

> I remember reading something quite a few years ago and it was—it was actually spoken by a famous prosecutor in a major case. . . .
>
> And I'd like to impart this to you now.  I can't improve upon this, so I'm just going to quote it verbatim[:]

21

"The suspended judgment with which we open this case is no longer appropriate. The time has come for final judgment. And if the case I present seems harsh and uncompromising it is because the evidence makes it so. If you were to save these men, that they are not guilty, it would be as true to say there are no slain, there has been no crime."

Defendant maintains that the "major case" referred to by the prosecutor "when he told [the] jury it had a duty to convict" was the Nuremberg trials. He contends the misconduct requires reversal as "[t]he State's case rested on the issue of the identification" and "[t]he State . . . interfered with that process" arguing defendant must be guilty because Cuttino was killed.[5]

Arguably, the prosecutor's remarks were not prejudicial because they were not objected to by defense counsel. See R.B., 183 N.J. at 333 ("Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial." (citation omitted)). Had there been an objection, the trial court would have been prompted to consider striking the remarks and to provide specific curative instructions to address them. See State v. Smith, 212 N.J. 365,

---

[5] Defendant and the State filed Rule 2:6-11(d) letters, directing our attention to two unpublished decisions that reached different conclusions on this same issue. We do not cite them as they have no precedential value. R. 1:36-3.

403-04 (2012). Because defendant did not object at trial to the prosecutor's remarks, we review them for plain error. See R. 2:10-2.

Prosecutors are entitled to zealously argue the merits of the State's case, Smith, 212 N.J. at 403, but they still occupy a special position in our system of criminal justice, see State v. Daniels, 182 N.J. 80, 96 (2004). "[A] prosecutor must refrain from improper methods that result in a wrongful conviction, and is obligated to use legitimate means to bring about a just conviction." Ibid. (quoting State v. Smith, 167 N.J. 158, 177 (2001)). Even if the prosecutor exceeds the bounds of proper conduct, "[a] finding of prosecutorial misconduct does not end a reviewing court's inquiry because, in order to justify reversal, the misconduct must have been 'so egregious that it deprived the defendant of a fair trial.'" Smith, 167 N.J. at 181 (quoting State v. Frost, 158 N.J. 76, 83 (1999)). Said another way, to warrant a new trial, summation remarks must be "so prejudicial that 'it clearly and convincingly appears that there was a miscarriage of justice under the law.'" Bender v. Adelson, 187 N.J. 411, 431 (2006) (quoting R. 4:49-1(a)). A reviewing court evaluates challenged remarks not in isolation but in the context of summation as a whole. State v. Atwater, 400 N.J. Super. 319, 335 (App. Div. 2008) (citing State v. Carter, 91 N.J. 86, 105 (1982)). Also,

the challenged remarks are to be "viewed in the context of the entire record." State v. Bey, 129 N.J. 557, 622 (1992).

Given the prosecutor did not identify "the famous prosecutor" or "major case," we have no sense of knowing whether the jury realized the reference was to United States Chief of Counsel Robert Jackson's closing argument during the 1945 to 1949 trials of Nazi military officials and their supporters for charges of crimes against peace and humanity. See Nuremberg Trials, History (June 7, 2019), https://www.history.com/topics/world-war-ii/nuremberg-trials; Robert H. Jackson, Closing Arguments for Conviction of Nazi War Criminals, 20 Temp. L.Q. 85, 86, 107 (1946). Indeed, we doubt that the jury hearing a case some seventy years later made the connection, but the possible connection is disconcerting.

This is a close call. But we conclude the remarks were so out of line and unrelated to any evidence or issue in the trial that they infected the jury's deliberation, and deprived defendant of a fair trial. We reject the State's contention the comment was inconsequential because it was "a quick singular moment at the very end of summation" and that the jury's request for a review of the elements of the crime before rendering its verdict showed "[t]his quick,

seconds-long quote was obviously not enough to make the jury forget the evidence in pursuit of some vague rhetoric."

The fact that the prosecutor's remarks were taken from the Nuremberg trials is not dispositive. The remarks were not meant to counter defendant's trial strategy or summation argument, nor related to trial evidence. See State v. Munoz, 340 N.J. Super. 204, 216 (App. Div. 2001) ("A prosecutor is permitted to respond to an argument raised by the defense so long as it does not constitute a foray beyond the evidence adduced at trial."). We recognize the trial court's jury charges correctly informed the jury of the State's burden of proof.

The remarks, however, the minimized the State's proofs against defendant to secure his convictions. The prosecutor intruded upon defendant's right to a fair trial: informing the jurors to choose between competing burdens of proof, intimating defendant must be guilty simply because a killing occurred. Because he remarks were prejudicial and denied defendant a fair trial, we are constrained to reverse his convictions.

V.

Because we are remanding for a new trial, it is not necessary to address defendant's contentions raised in Points IV – failing to replay Allen's cross-examination, V– cumulative error, and VI – sentence.

25

Reverse and remanded for retrial.  We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-0981-21