812 A.2d 1143 (2003)
356 N.J. Super. 413
STATE of New Jersey, Plaintiff/Respondent,
v.
Kendall J. JENKINS, Defendant/Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted October 16, 2002.
Decided January 8, 2003.
*1145 Yvonne Smith Segars, Public Defender, attorney for appellant (Donald T. Thelander, Assistant Deputy Public Defender, of counsel and on the brief).
Peter C. Harvey, Acting Attorney General of New Jersey, attorney for respondent (Jeanne Screen, Deputy Attorney General, of counsel and on the brief).
Before Judges WALLACE, JR., CIANCIA and AXELRAD.
*1144 The opinion of the court was delivered by WALLACE, JR., J.A.D.
Tried by a jury, defendant was found guilty of first degree murder, N.J.S.A. 2C:11-3a(1) and (2); third degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d); fourth degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d); and fourth degree witness retaliation, N.J.S.A. 2C:28-5(b). The trial court merged the weapons offenses into *1146 the murder conviction and sentenced defendant to a life term with a thirty-year period of parole ineligibility for murder and imposed a concurrent eighteen-month term for witness retaliation. The court also imposed appropriate fines and penalties.
On appeal, defendant makes the following arguments in his brief.
POINT I:
THE ADMISSION OF HIGHLY PREJUDICIAL AND IRRELEVANT EVIDENCE OF OTHER BAD ACTS, ALLEGEDLY COMMITTED BY THE DEFENDANT, WITHOUT ANY SANITIZATION OR ANY MEANINGFUL LIMITING INSTRUCTION FROM THE COURT, DEPRIVED THE DEFENDANT OF HIS FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO DUE PROCESS OF LAW AND A FAIR TRIAL (U.S. CONST. AMENDS. V, VI AND XIV; N.J. CONST., ART. I, PARS. 1, 9 AND 10) (NOT RAISED BELOW).
A. The Other Bad-Acts Evidence
B. The Court's Limiting Instruction
POINT II:
THE TESTIMONY OF JANE DUNBAR THAT SHE HAD ORDERED THE DEFENDANT TO LEAVE HER HOME BASED ON CONVERSATIONS THAT SHE HAD WITH PEOPLE IN THE COURTYARD, WHERE THE DECEDENT HAD BEEN MURDERED, THE TESTIMONY OF OFFICER CHARLES MILLER THAT HE HEARD A WOMAN IN JANE DUNBAR'S APARTMENT BUILDING YELLING AT THE DEFENDANT STATING "THEY SAID YOU KILLED THAT MAN," AND THE TESTIMONY OF TERRY MCCLAIN THAT ADRIAN BOULDIN HAD TOLD HER THAT THE DEFENDANT HAD "ALREADY KILLED" IN REFERENCE TO MARK COTTON VIOLATED DEFENDANT'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO CONFRONTATION, DUE PROCESS AND A FAIR TRIAL; THIS ERROR WAS COMPOUNDED BY THE MISCONDUCT OF THE PROSECUTOR IN SUMMATION IN COMMENTING ON THIS INADMISSIBLE HEARSAY TESTIMONY (NOT RAISED BELOW).
POINT III:
THE FAILURE OF THE TRIAL COURT TO INSTRUCT THE JURY ON THE LESSER-INCLUDED OFFENSES OF AGGRAVATED MANSLAUGHTER AND RECKLESS MANSLAUGHTER, CONSTITUTED A VIOLATION OF DEFENDANT'S RIGHT TO DUE PROCESS OF LAW AND A FAIR TRIAL. U.S. CONST. AMENDS. V, VI AND XIV; N.J. CONST. ART. I, PARS. 1, 9 AND 10 (NOT RAISED BELOW).
POINT IV:
THE REFUSAL OF THE TRIAL COURT TO INSTRUCT THE JURY IN ACCORDANCE WITH THE MODEL JURY CHARGE ON IDENTIFICATION, DENIED THE DEFENDANT'S RIGHT TO A FAIR TRIAL AND DUE PROCESS OF LAW. U.S. CONST. AMENDS. V, VI AND XIV; N.J. CONST. ART, I, PARS. 1, 9 AND 10 (PARTIALLY RAISED BELOW).
POINT V:
THE DEFENDANT'S SENTENCE OF LIFE IMPRISONMENT WITH 30 YEARS TO BE SERVED PRIOR TO BECOMING ELIGIBLE FOR PAROLE IS MANIFESTLY EXCESSIVE, UNDULY PUNITIVE AND NOT IN CONFORMANCE WITH THE CODE OF CRIMINAL JUSTICE.
*1147 We are constrained to reverse and remand for a new trial.
On the morning of May 8, 2000, defendant and some friends were on the porch of Angie Sanford's apartment in the Lexington Courts housing complex in Atlantic City, New Jersey, when Arthur Thomas approached the porch to buy drugs. As Thomas walked away, defendant stated that Thomas had "snitched on him." Defendant was referring to the fact that a year earlier, Thomas had testified against defendant in a murder trial where defendant was acquitted. Thomas had recently been released from a drug program before his encounter with defendant.
Defendant grabbed a gray brick, took several steps forward and struck Thomas very hard in the head with the brick. Thomas fell forward, head first, down a flight of stairs and hit his head on a concrete sidewalk below. He subsequently died.
At the time of the incident, LeVerne Garland was in a nearby apartment with her niece, Adrian Bouldin, when she heard Bouldin yell for help. Garland entered the balcony in time to see Thomas fall down the steps and defendant run away. Bouldin told Garland what happened, and Garland immediately went to a pay phone to call the police. She reported the incident and hung up. She called a second time. This time she named defendant as the assailant and indicated he was still in the area. Garland later gave a taped recorded statement to the police on May 10, 2000.
While en route to the scene, police officers Mary McMenamin and Charles Miller, of the Atlantic City Police Department, were flagged down by Chevon Faulkner. Faulkner told the officers that "a man was down" and that he had been hit in the head with a brick.
The officers found Thomas lying face down on a concrete surface at the bottom of a concrete stairway. There was a large amount of blood coming from Thomas's head, and a gray brick lay next to him. Officer Miller concluded that Thomas was dead.
Thereafter, McMenamin and police officer Autumn Mason sought to speak with Faulkner, but she was reluctant to answer any questions. Faulkner's mother invited the officers inside her apartment to speak with her daughter. The officers agreed, but Faulkner still did not want to talk with them. Ultimately, they agreed that Faulkner would go to the police station to discuss what she saw.
Meanwhile, defendant went to Jane Dunbar's apartment. Dunbar was the mother of one of defendant's friends. Defendant entered the bedroom of Dunbar's eleven-year-old son and began playing video games with him. Shortly thereafter, police arrived in the courtyard. While in the apartment, defendant asked the boy twice to look out the window and check if the police were still there.
The boy subsequently alerted his mother to the police activity, and she ascertained from one of the officers that someone had been killed. Dunbar noticed defendant was in her son's bedroom. She went outside and spoke to a group of neighbors to find out what happened. Based on information she learned during that conversation, Dunbar returned to her apartment and ordered defendant to leave. By this time, defendant had changed his clothes and placed his pants in the hamper. He left the apartment.
Around the same time, Officer Miller heard a female voice coming from the vicinity of Dunbar's apartment yelling, "They said you killed that man, I want you out of my house now." Miller and other officers went to investigate. A search of *1148 Dunbar's apartment revealed a pair of tan camouflage pants in the laundry area, which matched the description of what the assailant was wearing at the time of the incident.
Defendant next entered Rasheena Besmoore's apartment. Besmoore left and approached Officer Mason, whom she knew from high school. Besmoore told Mason that defendant was in her apartment. The police went to Besmoore's apartment, found defendant there and placed him under arrest.
Later that evening, Detective McFadden returned to interview witnesses in the area. Faulkner did not want to talk about it, but she took McFadden's notebook and wrote: "Kendall Jenkins a/k/a Freak hit a man in the head with a brick and he fell down the steps and hit his head." Faulkner's mother made arrangements to meet with the police at a different location. Later, once at the prosecutor's office, Faulkner identified a photograph of defendant, whom she had known for six or seven months and recognized on sight. She also gave a formal taped statement where she identified defendant as the man who struck Thomas with a brick.
Bouldin also gave a formal statement on the day of the murder that implicated defendant. Although Bouldin agreed to give a formal statement, she indicated she was very frightened for herself and her family if she "were to be a witness in the case."
Defendant was advised that bail had been set for $500,000. He expressed surprise at such high bail "for a guy getting hit with a rock." Defendant added, "Why do we have to do all this ... the guy was a nobody." While in the County Jail, defendant allegedly confessed to fellow inmate Edmond Garland that he killed Thomas. Edmond Garland, who had known defendant since their youth, contacted the police and reported defendant's confession. Edmond Garland stated that in several conversations defendant admitted that after selling drugs to Thomas he recognized Thomas as the man who testified against him. He then "bashed" Thomas in the back of the head. After an inmate threatened him about his statement, Edmond Garland attempted to retract the statement. At trial, however, Edmond Garland testified that his original statement about defendant's confession was truthful. He denied being offered any promises of leniency or reduction in his sentence for his testimony.
On June 6, 2000, about a month after the homicide, Faulkner contacted Detective McFadden and indicated she had received threats regarding her cooperation with the police. Some time thereafter, Faulkner retracted her statement to police, claiming she had lied because she wanted to collect a reward from "Crime Stoppers," though she later admitted she never applied for a reward. At trial, Faulkner testified that what she told the police in her May 8th statement was true, while still maintaining she did not see defendant do anything to Thomas on that date.
Bouldin also retracted her statement, claiming she was high on drugs when she gave her statement to the police. At trial, Bouldin maintained she lied to police when she implicated defendant in her sworn statement. The officer who took her statement, however, testified that Bouldin did not appear to be under the influence of drugs. Bouldin's statement was admitted in evidence.
On December 14, 2000, LeVerne Garland gave a second sworn statement to police. She indicated that an individual named "Little Ockey" came to her apartment complaining that LeVerne Garland's niece, Bouldin, was named in defendant's discovery material. "Little Ockey" told *1149 LeVerne Garland that Bouldin told "a bunch of lies" which could result in defendant's getting sixty-three years to life in prison. He tried to persuade LeVerne Garland to talk to Bouldin to change her statement because otherwise, Bouldin could get hurt or killed. LeVerne Garland also told the police about a letter defendant sent to her that expressed concern with Bouldin's cooperation with the police.
At trial, LeVerne Garland also recanted her earlier statements and testified that she could not recall anything regarding the homicide. Her sworn statements were then admitted into evidence.
The county medical examiner, Dr. Hydrow Park, testified he observed a blunt trauma injury behind Thomas' left ear. Dr. Park opined that it took a blow of "substantial force" by a "heavy object" to cause the injury to Thomas. He said the half-brick found at the scene was probably the weapon used. He noted that such a blow would ordinarily cause a severe brain concussion and temporary loss of consciousness. He opined that the cause of death was not the blow to the back of the head, but rather the fracture to the front of the head when Thomas fell. Dr. Park explained that the blow to the head was strong enough to cause him to lose consciousness and fall head first to the concrete surface below, sustaining serious injuries to the skull and brain.
Defendant did not testify or present any witnesses on his behalf.

I
We turn now to defendant's contention that the trial court's failure to sua sponte instruct the jury on the lesser included offenses of aggravated manslaughter and reckless manslaughter deprived him of a fair trial. Defendant not only did not raise this argument below, he expressly informed the trial court he did not want a lesser included charge.
At the charge conference, defense counsel informed the court that although he believed manslaughter was a lesser included offense of the murder charge, defendant requested that manslaughter not be charged. The prosecutor responded that case law requires the court to charge lesser included offenses if there is substantial evidence in the case with regard to those offenses, notwithstanding defendant's tactical decision to seek an all-or-nothing verdict. Further the prosecutor added:
I think in fairness, Your Honor, there is evidence from which a jury could consider murder. There is evidence from which a jury could conclude there was an aggravated manslaughter. There is evidence from which a jury could conclude that there was a reckless manslaughter.
I suggest to the court that, although the State's theory of the case is that there is a murder, that these lesser included crimes are legitimately in the evidence and that the court, I think, has an obligation to charge them, notwithstanding an effort for tactical reasons by the defendant to such an all or nothing verdict.
After the court raised some concern whether there was any reckless conduct, the prosecutor explained that:
if a jury were to conclude that there was an intentional assault but there was no intent to kill, but there was the risk that death could possibly result, that fits the definition of manslaughter. As with aggravated manslaughter, it's essentially the same charge except there it would be that the risk disregarded was the probability of death.
The prosecutor concluded his comment by stating that if the court was satisfied that *1150 no reasonable jury could find recklessness then he would rely on the court's discretion not to give a lesser included offense. The court recognized its obligation to charge lesser included offenses, but concluded there was no rational basis for a jury to find defendant guilty of manslaughter as a lesser included offense of murder.
Where the facts clearly indicate that the jury could find defendant guilty of a lesser included offense, the court should charge the lesser included offense even if defendant does not request the charge. State v. Purnell, 126 N.J. 518, 531-32, 601 A.2d 175 (1992); State v. Powell, 84 N.J. 305, 318, 419 A.2d 406 (1980); State v. Gallagher, 286 N.J.Super. 1, 13, 668 A.2d 55 (App.Div.1995), certif. denied, 146 N.J. 569, 683 A.2d 1164 (1996); State v. Clarke, 198 N.J.Super. 219, 224, 486 A.2d 935 (App.Div.1985); See also N.J.S.A. 2C:1-8d. The Court explained in Purnell, that it has "consistently held that all forms of homicide rationally supported by the evidence, whether they be lesser-included or alternative offenses, should be placed before the jury." Purnell, supra, 126 N.J. at 530, 601 A.2d 175. Further, the Court stated that it was unacceptable to "truncate the definitions of the murder statute and thus deny a jury the mechanism to decide which of the forms of murder has been proven...." Id. at 530-31, 601 A.2d 175 (citing State v. Long, 119 N.J. 439, 462, 575 A.2d 435 (1990)).
N.J.S.A. 2C:11-3(1) and (2) provide that a person commits murder if "the actor purposely or knowingly" causes death or serious bodily injury resulting in death. The manslaughter statute, N.J.S.A. 2C:11-4a, provides that a person commits first degree aggravated manslaughter "when [t]he actor recklessly causes death under circumstances manifesting extreme indifference to human life" and it is second degree manslaughter if it is committed recklessly. N.J.S.A. 2C:11-4b(1). The difference between aggravated manslaughter and manslaughter is if the risk of death is a probability, the crime is aggravated manslaughter, while if the risk of death is a possibility, the crime is manslaughter. State v. Breakiron, 108 N.J. 591, 605, 532 A.2d 199 (1987).
In State v. Cruz, 163 N.J. 403, 749 A.2d 832 (2000), the Court set out the elements of serious bodily injury (SBI) murder:
Accordingly, to convict a defendant on a charge of purposeful, non-capital SBI murder the State must prove that the defendant's conscious object was to cause serious bodily injury that then resulted in the victim's death, knew that the injury created a substantial risk of death and that it was highly probable that death would result. To prevail on a charge of knowing non-capital SBI murder the State must prove that the defendant was aware that it was practically certain that his conduct would cause serious bodily injury that then resulted in the victim's death, knew that the injury created a substantial risk of death and that it was highly probable that death would result.
[Id. at 418, 749 A.2d 832.]
Further, the Court noted "[a] lower degree of culpability is required to prove aggravated manslaughter, for which the prosecution must show that the defendant was aware of and consciously disregarded a substantial risk of death, i.e., a probability that death would result, and that the defendant manifested extreme indifference to human life." Id. at 417, 749 A.2d 832.
Here, the evidence established that defendant intentionally struck the victim in the head with a brick as revenge for the victim having testified against him at a *1151 prior trial. The same evidence, however, that supported the conclusion that defendant intended to cause serious bodily injury that resulted in death could have reasonably been interpreted by the jury as aggravated manslaughter based on indifference to human life. Recall that the State's expert testified that the blow to the head alone did not cause the victim's death, but the accompanying fall. Thus, the jury could have found that defendant's conduct was not practically certain to cause death, but that he was aware of a probability that death would result and manifested extreme indifference to human life and found him guilty of the lesser offense of aggravated manslaughter. See State v. Bowens, 108 N.J. 622, 637-38, 532 A.2d 215 (1987) (force of defendant's single stab into the victim's abdomen and the extent of injuries was sufficient to support a jury finding of aggravated manslaughter based on indifference to human life). See also State v. Nutter, 258 N.J.Super. 41, 58-59, 609 A.2d 65 (App.Div.1992)(a drunken attack involving a single stab wound supported a charge of aggravated manslaughter as a lesser included offense of murder).
We are convinced that despite defendant's request not to charge any lesser included offenses to murder, based on the proofs presented at trial, the trial court should have granted the State's request to charge aggravated manslaughter and reckless manslaughter. The evidence clearly presented a rational basis for the jury to acquit defendant of murder and to convict him of a lesser included offense. We are constrained to reverse defendant's conviction for murder and remand for a new trial.

II
Defendant contends that the trial court erred in allowing the State to introduce other crimes evidence inadmissible under N.J.R.E. 404(b), in failing to sanitize this evidence, and in failing to instruct the jury on the limited use of this evidence. Defendant's primary complaint is the admission of evidence that the victim had testified against defendant at a previous murder trial where defendant was acquitted.
Initially, we note that except for the playing of a videotaped excerpt of Thomas' testimony at the prior murder trial, defendant failed to object to the other crimes evidence. Consequently, we view those arguments under the plain error standard, i.e. whether the error was clearly capable of producing an unjust result. R. 2:10-2. At trial, Sergeant DeShields testified that Thomas provided information to the police concerning the shooting death of Mark Cotton. He said that Thomas identified defendant from a photo array as the person he saw with a gun, that Thomas gave a statement implicating defendant in the shooting and that Thomas testified against defendant at trial. Defendant did not object to this testimony by DeShields. Later, when the State sought to play the videotape of Thomas's testimony at the previous murder trial, defendant objected. The prosecutor argued it was relevant to prove an element of the witness retaliation charge. The trial court ruled the State could play the videotape, but that an instruction would be given to the jury on the limited purpose of such evidence. Prior to playing the videotape, the trial court instructed the jury as follows:
The Prosecutor apparently is going to play a portion of the testimony of Arthur Thomas from this previous trial. Now, bear in mind, ladies and gentlemen, this, that this is not being admitted for the purpose of proving the truth of what Thomas testified to *1152 simply that he testified to certain matters for the purpose of proving that he was a witness and testified.
The excerpt of Thomas's identification of defendant as the person with a gun was then played for the jury.
The prosecutor also elicited testimony from Edmond Garland that defendant told him in prison that after selling cocaine to Thomas, he recognized Thomas as the person who testified against him, so he hit him in the head with a brick. Further, Edmond Garland testified that defendant also stated that Al Sharif, who was present at the incident with Thomas, said "you've done it again. I don't believe this. You've done it again."
In addition, the state presented the testimony of Jane Dunbar that she ordered defendant to leave her apartment a short while after the incident based upon conversations she had with people in the courtyard. Police Officer Charles Miller testified he heard someone in the vicinity of Dunbar's apartment shout, "they say you killed that man. I want you out of my house now."
We set forth the controlling principles. Generally, evidence of defendant's prior crimes, wrongs or acts are not admissible to prove criminal disposition. N.J.R.E. 404(a). Such evidence, however, may be admissible to prove other purposes "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identify or absence of mistake or accident...." N.J.R.E. 404(b). The danger of admitting other crime evidence is that the jury may convict defendant because he is a bad person. State v. Stevens, 115 N.J. 289, 302-303, 558 A.2d 833 (1989). The trial court should hold a hearing to determine whether to admit the evidence. In order to admit other crimes evidence, it must possess the following characteristics:
1. The evidence of the other crime must be admissible as relevant to a material issue;
2. It must be similar in kind and reasonably close in time to the offense charged;
3. The evidence of the other crime must be clear and convincing; and
4. The probative value of the evidence must not be outweighed by its apparent prejudice.
[State v. Cofield, 127 N.J. 328, 338, 605 A.2d 230 (1992) (citations omitted).]
The evidence must be relevant to a material issue that is genuinely in dispute. Ibid. (citing State v. Stevens, 115 N.J. 289, 301, 558 A.2d 833 (1989)). Where the evidence is deemed admissible, it is important that the trial court craft a limiting instruction "that will explain to the jury the limited purpose for which the other crimes evidence is being offered." State v. Fortin, 162 N.J. 517, 534, 745 A.2d 509 (2000). Moreover, "in addition to its inclusion in the final jury charge, a prompt delivery of limiting instructions, either before, simultaneously with, or immediately after, the admission of other crimes evidence is preferable[.]" State v. Angoy, 329 N.J.Super. 79, 89-90, 746 A.2d 1046 (App.Div.), certif. denied, 165 N.J. 138, 754 A.2d 1214 (2000).
Conduct which is part and parcel of the offense being tried or res gestae evidence is not excludible under N.J.R.E. 404(b). State v. Martini, 131 N.J. 176, 240-42, 619 A.2d 1208 (1993). Res gestae evidence is used to refer to events surrounding the issue being litigated, or "other events contemporaneously with them." State v. Long, 173 N.J. 138, 168, 801 A.2d 221 (2002) (Stein, G., concurring in part, dissenting in part). "In contrast to other-crimes evidence, ... res gestae evidence *1153 relates directly to the crime for which a defendant is being tried, rather than involving a separate crime." State v. L.P., 338 N.J.Super. 227, 235, 768 A.2d 795 (App.Div.), certif. denied, 170 N.J. 205, 785 A.2d 434 (2001). Although the res gestae evidence is not subject to a Rule 404(b) analysis, res gestae evidence is subject to Rule 403 balancing. State v. Long, supra, 173 N.J. at 161, 801 A.2d 221. Pursuant to N.J.R.E. 403, evidence that is otherwise admissible may be excluded if the trial court determines that "its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury...." The burden is on the party urging exclusion of the evidence to convince the court that the N.J.R.E. 403 considerations control. See Rosenblit v. Zimmerman, 166 N.J. 391, 410, 766 A.2d 749 (2001). In any event, "the probative value prejudicial impact analysis under Rule 403 and Rule 404(b) are the same." State v. Long, supra, 173 N.J. at 161, 801 A.2d 221.
Here, the evidence that Thomas testified against defendant at a prior trial was offered to prove an element of the "retaliation against a witness" charge and to establish a motive for the murder charge. The motive evidence was highly relevant in this case. "A wider range of evidence is admissible to establish motive or intent than is permitted in support of other issues." State v. Crumb, 277 N.J.Super. 311, 317, 649 A.2d 879 (App. Div.1994). As noted above, the trial court permitted, over defendant's objection, the playing of a videotaped excerpt of Thomas's testimony at the prior murder trial which identified defendant as the suspect and cautioned the jury that the evidence was not being admitted for the truth of what Thomas testified, but merely to prove that he was a witness against defendant.
We are satisfied that the trial court did not abuse its discretion in admitting this evidence. Whether under a Rule 404(b) analysis, or a Rule 403 analysis, the evidence was highly relevant and not unduly prejudicial to warrant exclusion. Although not requested to do so, we are convinced that if the court had been requested to undertake a 404(b) analysis, the court would have found the other crimes evidence of Thomas's testimony against defendant satisfied the four-prong Cofield test.
We need not decide whether the remaining other crimes evidence should have been excluded or sanitized. We reluctantly conclude the cumulative effect of the multitude of other crimes evidence admitted at trial without clear and complete limiting instructions deprived defendant of a fair trial. In State v. Stevens, 115 N.J. 289, 558 A.2d 833 (1989), the Court explained that because "the inherently prejudicial nature of [other crimes] evidence casts doubt on a jury's ability to follow even the most precise limiting instruction", 115 N.J. at 309, 558 A.2d 833, the trial court's instruction "should be formulated carefully to explain precisely the permitted and prohibited purposes of the evidence, with sufficient reference to the factual context of the case to enable the jury to comprehend and appreciate the fine distinction to which it is required to adhere." Id. at 304, 558 A.2d 833.
Here, except for the victim's videotaped testimony, the trial court gave no limiting instructions. Moreover, the trial court's instruction to the jury at the time the videotape was admitted was inadequate, as it merely informed the jury not to consider the truth of Thomas's testimony and failed to "clarify for the jury the narrow distinction between the permissible and impermissible uses of the other-crime evidence." Id. at 308-09, 558 A.2d 833. The failure of *1154 the trial court to focus the jury's attention on the limited purpose for which the evidence was admissible allowed the jury to find that defendant was a bad person who sold drugs and probably was guilty of the charges. At no time during the trial did the trial court inform the jury that it could not use the other crimes evidence to find propensity. Even though no limiting instruction is normally necessary for res gestae evidence, see State v. Martini, supra, 131 N.J. at 242, 619 A.2d 1208, because this same evidence addressed the victim's prior accusation against defendant, it was admitted as both res gestae and motive evidence. Therefore, an appropriate instruction limiting the use of the motive evidence should have been given. Moreover, a limiting instruction would have helped "to ensure that the prosecutor would not use the motive evidence improperly during [opening and] summation." State v. Long, supra, 173 N.J. at 165, 801 A.2d 221.
We add one additional point. On remand, if the State seeks to admit other crimes evidence at retrial, the trial court should consider whether it would be appropriate to "sanitize" the other crimes evidence by confining its admissibility to those facts reasonably necessary for the probative purpose "for which the evidence is offered." State v. Fortin, 318 N.J.Super. 577, 598, 724 A.2d 818 (App.Div.1999), aff'd, 162 N.J. 517, 745 A.2d 509 (2000). See also State v. Collier, 316 N.J.Super. 181, 195, 719 A.2d 1276 (App.Div.1998), aff'd o.b., 162 N.J. 27, 738 A.2d 369 (1999). For example, if the defense were to stipulate to the essence of Thomas's testimony at the prior trial, there would be no need to show the videotape of Thomas's testimony. See State v. Darby, 174 N.J. 509, 521, 809 A.2d 138 (2002).
Our review of the record satisfies us that the admission of the other crimes evidence without a limiting instruction and without appropriate sanitizing, so tainted the trial that we are compelled to reverse and remand for a new trial.

III
We find no merit to defendant's contention regarding the failure to give an identification charge. R. 2:11-3(e)(2).
We reverse and remand for a new trial.