STATE

v.

Charles PONA.

No. 2004–234–C.A.

Supreme Court of Rhode Island.

June 12, 2008.

Christopher R. Bush, Esq., for Plaintiff.

George J. West, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice FLAHERTY, for the Court.

Jennifer Rivera, an eighth-grade student at Roger Williams Middle School, who stood five feet, one-inch tall and weighed all of seventy-two pounds, was murdered by Dennard Walker, who fired three gunshots into the back of her head while she was standing on the sidewalk outside her home in Providence on May 21, 2000. What distinguishes this homicide from the other mindless violence to which we sadly have become accustomed is that Jennifer had testified at a bail hearing at which she had identified a suspect in the murder of Hector Feliciano, and she was scheduled to testify at the imminent murder trial. The defendant in that case was Charles "Manny" Pona, also the defendant in this case. Jennifer's murderer, Dennard Walker, is Pona's half brother. There is no question that Walker, who pled guilty to killing Jennifer, murdered this young girl to prevent her from testifying against Pona.

Although Walker admitted to being the triggerman in this unspeakable act, which shakes the very foundation of our system of justice, Pona also was indicted for Jennifer's murder on the theory that he had conspired with Walker and Miguel Perez to have her killed. Specifically, Pona was

charged with murder, conspiracy to murder, carrying a firearm without a license, committing a crime of violence while carrying a firearm, and obstruction of justice. A jury convicted Pona on all counts, and he was sentenced to life imprisonment for murder to be served consecutively with the sentence he now is serving for killing seventeen-year-old Hector Feliciano.[1] Pona also was sentenced to serve two terms of ten years for committing a crime of violence while armed with a firearm and carrying a handgun without a license, both running consecutively to the life sentence, another ten years for conspiracy, to be served concurrently, and five years for obstruction of justice, also to be served concurrently.

On appeal, defendant argues that an amalgam of errors was made during his trial for Jennifer's murder, and that the culmination of these errors deprived him of the right to a fair trial by an impartial jury. These claimed errors include: (1) that the trial justice did not conduct a separate *in camera* hearing to question two jurors who admitted to seeing television news coverage on Pona, (2) that the trial justice should have passed the case because of pretrial publicity, (3) that defendant's constitutional right to a jury of his peers was violated because all members of the jury were white, (4) that certain evidence relative to the Feliciano murder, including a police photopack, pager, and fingerprint evidence, should not have been admitted into evidence during his trial for the murder of Jennifer, (5) that the admission of the entire tape recording of Jennifer's bail testimony was not only unfairly prejudicial and inadmissible hearsay, but also violated defendant's Sixth Amendment right to confrontation, (6) that a mistrial was warranted because of the unanticipated statement of a witness that defendant was a frequent purchaser of crack cocaine, (7) that a new trial should have been granted because the verdict was against the great weight of the evidence, and (8) that the sentence was excessively harsh and constituted cruel and unusual punishment.

After reviewing the record in this case, we agree that the trial justice erred in admitting "other crimes" evidence that related solely to Pona's conviction for Feliciano's murder, namely that Pona's pager that was found at the scene of Feliciano's murder and his fingerprints that were left in the car that was used to flee the area where that homicide occurred. We also are of the opinion that the trial justice committed reversible error when he admitted the entire audio-tape recording of Jennifer's bail-hearing testimony, permitting the jury to hear the young victim's "voice from the grave" (as described by the prosecutor in closing) for hours on end, especially when some of the substance of the bail-testimony tape focused entirely on demonstrating to the jury that Pona already was a dangerous murderer. Finally, although we reverse on other grounds, we are convinced that the unanticipated testimony concerning Pona's prior cocaine use, combined with an ineffective curative instruction, was error.

Although the shocking nature of this crime causes a tremor to the very core of our society, it is no less important that those accused of such heinous acts receive a fair trial. For the reasons set forth in this opinion, we vacate the judgments of conviction and we remand to the Superior Court for a new trial.

---

1. We affirmed Pona's conviction for the murder of Hector Feliciano in *State v. Pona,* 926 A.2d 592, 596 (R.I.2007).

## I
## Facts and Procedural History[2]

On August 28, 1999, Jennifer Rivera was cooking in her kitchen when she heard a series of gunshots.[3] She looked through her kitchen window and watched as a young black male, with a "fade"[4] style haircut, jumped a fence, got into a grey jeep, and drove away. About ten minutes later, Jennifer left her apartment to investigate what had happened. In the parking lot across the street, she found Hector Feliciano lying on the ground, mortally wounded. After rescue personnel and the police arrived on the scene, Jennifer spoke with the police, telling them what she had seen. She later picked out defendant from a photopack at the police station. After Pona was charged with the murder of Feliciano, Jennifer identified him in court at a bail hearing. She was the only witness who was able and willing to identify his face.

The very night before Pona's trial for the Feliciano murder was to begin, his half brother, Walker, fired three shots at Jennifer's head at point-blank range. The bullets were fired in rapid succession; two rounds entered the back of her skull, one round exited her face, and the other exited her neck. Walker not only pled guilty to murder but, significantly, to conspiring with Pona and Miguel Perez to kill Jennifer.[5]

After an intensive investigation, defendant was charged with conspiracy to commit murder, murder, carrying a pistol without a license, committing a crime of violence while carrying a firearm, and obstruction of justice.

At a pretrial hearing, defendant argued that any reference to his conviction for killing Feliciano unfairly would prejudice him in the eyes of the jury. The trial justice agreed and granted a motion to "exclude and preclude the State from mentioning that the defendant has been convicted of murder." The defendant also offered to stipulate "to the fact that Mr. Pona was charged with a felony, and the principal witness and the only witness was Jennifer Rivera."

The state agreed that a reference to Pona's conviction for Feliciano's murder would be unfairly prejudicial, but it successfully urged the trial justice to admit certain evidence that pertained to the Feliciano murder, including a photopack from which Jennifer identified Pona as the man she saw running after she heard gunshots, and the entire audio-tape recording of her

---

2. The complete facts with respect to the murder of Hector Feliciano are set forth in *Pona,* 926 A.2d at 596–99 and *Rivera v. Rhode Island,* 402 F.3d 27, 30–31 (1st Cir.2005). We will refer only to the facts significant to the issues presented here.

3. There is a sad commentary on the state of our society reflected in the colloquy between Jennifer and defense counsel at Pona's bail hearing:

"Q. How do you know what a gunshot sounds like?
"A. It is loud. It sounds like a gun.
"Q. Well a car backfiring's loud too, doesn't it? What is your familiarity with gunshots prior to August 28th, 1999?

"A. Come on. That is not the first time I hear a gun."

4. " 'Fade or Temple Fade—a short tapered cut. The hair at the back and sides is tapered from zero length lower down up to around half an inch. The hair may be short or longer over the crown of the head. On top, the hair is longer (up to 2 to 3 inches) and may be layered.' " *State v. Hall,* 940 A.2d 645, 649 n. 6 (R.I.2008).

5. During Pona's trial for Jennifer's murder, Walker testified that he killed Jennifer because of his love for his brother and because he wanted to prevent his brother from receiving a life sentence in prison for murdering Feliciano.

bail testimony hearing for that murder (plus a full transcript of that hearing). The state argued that all the evidence regarding the events leading up to Pona's trial for killing Feliciano should be admitted because those events were "inextricably intertwined" with the murderous assault against Jennifer. Furthermore, the state argued that the evidence fell under an exception to Rule 404(b) of the Rhode Island Rules of Evidence[6] because this evidence was being introduced to show defendant's motive to have Jennifer murdered. The state contended that admission of the evidence against Pona in the first trial for the murder of Feliciano was necessary because two state witnesses, Dennis Fullen and Miguel Perez, would testify that defendant had conversations with them about the evidence in his case in the context of killing Jennifer.

The defendant urged that the evidence was irrelevant and that it also unfairly prejudiced defendant because it was an attempted runaround the trial justice's earlier ruling that Pona's conviction would be excluded. The defendant argued that excluding the fact of conviction while continuing to interject the facts connecting Pona to the Feliciano murder into this trial unfairly prejudiced him.

The Superior Court accepted the state's position and, citing *Commonwealth v. Paddy*, 569 Pa. 47, 800 A.2d 294, 307–08 (2002), the trial justice ruled that the evidence surrounding the Feliciano murder was not admissible to prove his bad character, but was admissible as an exception to Rule 404(b) to explore the intensity of his motive to have Jennifer killed.[7]

At Pona's trial for Jennifer's murder, the state offered the testimony of numerous witnesses. The state presented the testimony of (1) Det. James Marsland, who had spoken to Jennifer at the scene of the Feliciano homicide; (2) Kong Meng Lee, a witness who testified to hearing gunshots and seeing someone run from the scene of Jennifer's murder; (3) Officer Stephen Gencarella and (4) Officer Joseph Donnelly, who both had arrived at the scene after Jennifer was shot; (5) Officer Vincent Mansolillo and (6) Officer Stephen Mokler, who had spoken with both Perez and Fullen about Pona's participation in Jennifer's murder; (7) Elizabeth Laposata, the medical examiner who conducted Jennifer's autopsy; (8) Dennis Fullen, who was housed at the Adult Correctional Institutions

---

6. Rule 404(b) of the Rhode Island Rules of Evidence provides:

> "*Other Crimes, Wrongs, or Acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or to prove that defendant feared imminent bodily harm and that the fear was reasonable."

7. In *Commonwealth v. Paddy*, 569 Pa. 47, 800 A.2d 294 (2002), the defendant was on trial for the murder of Lashawn Whaley, who was scheduled to be a witness against the defendant in the murder trial of two people. *Id.* at 300. During the trial, evidence was present-ed that included a redacted statement of Whaley that established she had witnessed the event, she had been interviewed by police, and she had identified Paddy as the shooter, and the testimony of Freddy Murphy that the defendant's friends had taken Whaley on a trip to Maryland and threatened to kill her if she testified. *Id.* at 300–02. On appeal, the defendant argued that he received ineffective assistance of counsel because of the breadth of "other crimes" evidence that was admitted into evidence during his trial. *Id.* at 307. The Pennsylvania Supreme Court upheld the conviction and stated that the prosecution was entitled "to demonstrate the strength of the proffered motive" and "the intensity with which [the defendant] pursued his goal of silencing Lashawn." *Id.* at 308.

(ACI) with defendant; (9) Dennard Walker, who confessed to committing Jennifer's murder; and (10) Miguel Perez, who confessed to driving the vehicle that Walker and Pona escaped in after the shooting. The following facts are harvested from the various witnesses' testimonies.

Fullen testified that he was a close family friend of Pona's late father, Charles Porter, and he said he knew Pona's family intimately for a number of years. Fullen said that during his incarceration at the ACI, he and Pona shared a cell for more than two months while Pona awaited release on bail after he was indicted for Feliciano's murder. Fullen said that Pona discussed with him the evidence that the state had against him in that case and that Pona said he would have to "dump" Jennifer to defend the case successfully. Fullen understood that to mean that Pona believed that he had to kill her. Fullen also testified that Pona was angry at Perez after he learned that Perez shot a bullet into the air to scare Jennifer, but that he did not kill her. Fullen testified that Pona said that he needed to make bail to insure that "it was done the correct way." Fullen understood this to mean that Pona intended to see that Jennifer was killed. During trial, it was revealed that in exchange for his testimony against Pona, Fullen was given a reduction in his sentence to serve at the ACI, and his wife and children were placed in the Witness Protection Program.

During an aggressive cross-examination, Fullen blurted out that Pona had purchased crack cocaine from him on a regular basis. Before an objection could pass defendant's lips, the trial justice struck the unexpected comment from the record and the jury was instructed to ignore what had been said:

"Q. But you can say you saw Mr. Pona [at Lockwood Plaza] every day?

"A. Yeah, I seen him. Matter of fact, you know what, I tell you the truth, Mr. Pona used to meet me and buy crack off me. I used to sell him eight balls.[8] I hung with him every day.

"THE COURT: The answer is stricken.

Members of the jury, you're instructed to ignore that answer.

Mr. Fullen, answer the question that is asked."

The defendant motioned to pass the case because of the prejudicial statement. The Court denied the motion, ruling that its instructions were sufficient.

Miguel Perez also testified on behalf of the state. Perez already had pled guilty to his involvement in Jennifer's murder; he was the driver of the vehicle in which Walker fled the scene. In exchange for his testimony, the state agreed not to charge Perez with first-degree murder if he would plead to a charge of second-degree murder. Perez had a child with Pona's sister, and he had known Pona for approximately seven years. Perez testified that about two weeks before Pona was released on bail, he saw Jennifer in front of her house playing with a group of other girls. Corroborating Fullen's story, Perez admitted to getting out of his car and firing a single shot into the air. Perez testified that he did this to scare Jennifer so that she would not testify against Pona in the Feliciano trial.

Eventually, Pona was released on bail. Perez testified that he, Pona, and Walker drove together in the vicinity of Jennifer's house the day she died. Perez testified that they saw Jennifer outside playing, and

---

8. This is equal to one-eighth of an ounce, or three and one-half grams. See *United States v. Whirlwind Soldier*, 499 F.3d 862, 867 n. 2 (8th Cir.2007) (citing *United States v. Campos*, 306 F.3d 577, 581 (8th Cir.2002)).

he circled the block before stopping on a nearby street. Before Walker got out of the car, Perez testified that Pona told Walker, "Make sure you do it right," which Perez understood as meaning that Walker should kill Jennifer. Walker replied, "Don't worry. [You] can't do life." Perez then told Walker to meet him at a prearranged location, close to Jennifer's apartment. Perez testified that he and Pona drove to the meeting spot and waited in the car. After hearing three gunshots, Perez watched Walker run toward them. Once Walker got into the car, Perez testified that Walker said, "I got her. I got her. Jet. Jet. Jet." After this, Pona replied, "I love you. I love you."

Before his confession for his role in Jennifer's murder, Perez was held in the ACI on unrelated charges. While there, Perez received a letter written by Pona. In the letter, Pona described how police officers had visited him to discuss Jennifer's murder, but that he had said nothing to them. In the letter, Pona also wrote, "I'm fighting to get on an [sic] appeal."

The letter was admitted into evidence and read to the jury over defendant's objection. He argued that the reference to his appeal indicated that Pona was convicted for the Feliciano murder and that it was unfairly prejudicial. The trial justice overruled the objection. He reasoned that he already had given sufficient cautionary instructions to the jurors that they should not infer anything from Pona's incarceration. The trial justice decided that it would be even more prejudicial to point out that defendant was incarcerated at that point, and he favored making another cautionary instruction later in the trial.

Walker, Jennifer's self-proclaimed murderer, then testified. Walker already had pled guilty to conspiring with Pona and Perez to kill Jennifer.[9] However, on the witness stand, he flatly denied that either Perez or Pona were with him when he killed Jennifer. Under oath, Walker asserted that he decided to kill Jennifer on his own, without discussing the matter with anyone else. Walker testified that he drove himself to the scene, murdered the

9. At trial, the prosecutor read portions of a transcript from Walker's hearing in which he pled guilty to murdering Jennifer:

"Q. * * * The Court then instructs you to be seated and asks to hear from the State as to the nature of the offenses * * *.

'If the matter had proceeded to trial on Indictment P1/01–1968AG, the State would show on Count 1 that Mr. Walker, along with Miguel Perez and a previously disclosed co-conspirator, Manny Pona, all of Providence County, on the 21st of May, 2000, in Providence, did murder Jennifer Rivera, that murder being a murder in the first degree. On Count 2, Mr. Walker, along with Miguel Perez and Manny Pona, again on May 21, 2000, in Providence, conspired or entered into an agreement to commit that murder of Jennifer Rivera in violation of the General Laws. Count 3, Mr. Walker and Mr. Perez, * * * along with Manny Pona, on the 21st day of May, 2000, in Providence, did, without a license, carry a handgun on or about their person in

violation of the General Laws. On Count 4, Mr. Walker, along with Mr. Perez and Manny Pona, on the 21st day of May, 2000, in Providence, committed a crime of violence, namely, the murder of Jennifer Rivera, while being armed with a firearm; and, Count 5, Mr. Walker, along with Miguel Perez and Manny Pona, on the 21st day of May, 2000, in Providence, did, by force, namely killing Jennifer Rivera, endeavor to influence, obstruct and impede the administration of justice in violation of the General Laws.'
" * * *

"And the Court then asks you, Mr. Walker, 'Mr. Walker, have you heard what the State's attorneys have told me? Is what they told me true?'

"Do you remember what your answer was?

"A. Yes.

"Q. What was your answer?

"A. Yes. Because I committed the crime, that's why."

young girl by himself, and then left the area alone. He disavowed not only his guilty plea to the extent that it implicated Perez and Pona, but also a tape-recorded conversation that he had with Fullen at the ACI that also implicated Perez and Pona. There is no doubt that the facts surrounding Jennifer's murder in Walker's prior statements corresponded with Perez's version of the events of that day. During his tape-recorded conversation with Fullen, Walker admitted to being dropped off by Perez and Pona, walking up to Jennifer alone, and shooting her. He also stated that Perez and Pona waited in the car for him, and that they drove off together.

Our primary focus is on the testimony of Det. James Marsland, the detective who was present at the scene of the Feliciano shooting and who spoke to Jennifer there. During Det. Marsland's testimony, the state moved to admit the photopack Jenni-

fer used to identify defendant. The prosecutor also solicited testimony from the detective that defendant's pager was found at the scene of Feliciano's murder and that defendant's fingerprints were found inside the vehicle that was observed leaving the area of the murder scene.[10] The defendant objected and moved to strike the testimony, but the trial justice overruled the objection.

Detective Marsland also testified that he met Jennifer Rivera at the Feliciano murder scene that day, and that she was the only person present who said she could identify the face of the man she saw running after the gunshots were fired. At this point, the trial justice stopped the detective's testimony and gave a cautionary instruction, in accordance with Rule 404(b), that the jury could consider that particular evidence only for the purpose of demonstrating that Pona had a motive, intent, or plan to kill Jennifer.[11] After the

10. On direct examination Det. Marsland discussed the full extent of the evidence found at the scene of the Feliciano murder.

"Q. * * * Did you discover any physical evidence that may have helped in your investigation [of the Feliciano homicide]?
"A. Yes.
"Q. What was that?
"MR. RUGGIERO: Objection. Your Honor. I don't see the relevance of it, Judge.
"THE COURT: Overruled. He may answer.
"THE WITNESS: Approximately two or three feet from where the victim had been found lying, we found a black pager * * * [that] was linked to the defendant, Charles Manny Pona.
"* * *
"Q. In addition to that pager, was anything else discovered in the course of your investigation that linked the defendant to the crime?
"A. Yes.
"Q. What else?
"MR. RUGGIERO: Objection once again, Judge.
"THE COURT: Overruled, you may answer.

"A. During the course of the investigation, we learned that after the shooting, the suspect had fled the area in a vehicle, and we later found the vehicle, and through our BCI processing the vehicle, they lifted latent fingerprints from inside the vehicle and those prints were later matched also to the defendant, Charles Pona.
"MR. RUGGIERO: Motion to strike, Judge.
"MR. GENDRON: Your Honor—
"THE COURT: I'll allow it. The answer may stand."

11. The trial justice warned the jurors,

"that you may not draw any inference that Mr. Pona committed the criminal offenses for which he is on trial before you simply because on some prior occasion, he allegedly committed other improper conduct. * * * [T]he State cannot utilize the so-called bad acts evidence to show that because the defendant may have, on some prior occasion, acted improperly, he, therefore, must have committed those crimes before you in this trial.
"However, * * * it is admitted for your consideration for the limited purpose of deciding issues such as whether the defendant

state rested, defendant did not testify, nor did he present any witnesses.

In our opinion, even though Pona was standing trial for participating in the murder of Jennifer, the admission of the evidence of Pona's pager and fingerprints led the jury to the inescapable conclusion that he also killed Feliciano, a crime for which he was not on trial. It seems to us that this was a clear abuse of discretion by the trial justice. The impact of this evidence was to highlight the propensity of Pona as a person who had murdered before and who would not hesitate to murder again. It is our opinion that the admission of this evidence, combined with the playing of the entire audio tape of Jennifer's bail-hearing testimony, in which her forever-stilled teenage voice was both un-redacted and hours-long, constitutes reversible error. By allowing this highly prejudicial evidence to come before the jury, the trial court placed the facts of another crime, the Feliciano murder, onto center stage, tempting the jury to hold defendant accountable on the facts of a case for which he was not on trial.[12]

## II

## The "Other Crimes" Rule and the Evidence from the Feliciano Murder

American jurisprudence has a long history of prohibiting the use of "other crimes, wrongs, or acts" as evidence to prove the propensity of a defendant to commit crimes. Rule 404(b). "The overriding policy of excluding such evidence * * * is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice." *State v. Gallagher*, 654 A.2d 1206, 1210 (R.I.1995) (quoting *State v. Colvin*, 425 A.2d 508, 511 (R.I.1981)).

"When a jury is allowed to consider independent crimes for which a defendant is not on trial, a real possibility exists that such an indication of bad character or bad acts would create prejudice in the minds of the jurors and improperly influence their decision in regard to the crimes charged. * * * The danger is that jurors may believe that the prior crimes or bad acts denote a propensity in a defendant to commit the crime with which he or she is charged." *Gallagher*, 654 A.2d at 1210.

■ When other crimes evidence is "prejudicial and irrelevant," its exclusion obviously is required; however, when relevance exists for purposes other than to show propensity, there are exceptions to the general rule that permit such evidence to be admitted. *State v. Martinez*, 651 A.2d 1189, 1194 (R.I.1994). Rule 404(b) permits the admission of "other crimes" evidence when it is offered to show something apart from "a probability that he has committed the crime on trial because he is a man of criminal character." *State v. Jalette*, 119 R.I. 614, 624, 382 A.2d 526, 532 (1978) (quoting McCormick, *Evidence* § 190 at 447 (2d ed. 1972)). Rule 404(b) contains a list of exceptions, including when the evidence offered establishes the motive or intent of the defendant, or when it is relevant to prove a material element of the crime with which the defendant is charged. *Gallagher*, 654 A.2d at 1210.

Charles Pona had a motive for committing the murder of Jennifer Rivera; whether the defendant, Charles Pona, had a specific intent to commit the murder of Jennifer Rivera; whether the defendant, Charles Pona, had a plan to murder Jennifer Rivera. You may not consider this evidence for any other purpose."

12. Because we reverse on these stated grounds, we decline to reach the other issues presented.

We also have permitted the introduction of "other crimes" evidence when crimes are interwoven or in instances when introduction is necessary for "a trier of fact to hear a complete and, it is to be hoped, coherent story so as to make an accurate determination of guilt or innocence." *State v. Gomes,* 690 A.2d 310, 316 (R.I.1997).

We have said that "[t]he line between Rule 404(b) evidence presented for the impermissible purpose of demonstrating propensity and Rule 404(b) evidence presented for one of the specific non-propensity exceptions is 'both a fine one to draw and an even more difficult one for judges and juries to follow.'" *State v. Brown,* 900 A.2d 1155, 1160 (R.I.2006) (quoting *State v. Garcia,* 743 A.2d 1038, 1052 (R.I.2000)).

"In deciding whether to admit evidence pursuant to Rule 404(b), a trial justice must carefully weigh the possibility that this evidence will unfairly prejudice the accused, and in the event the trial justice finds that the probative value of the evidence outweighs the danger of unfair prejudice, the trial justice must offer 'a specific instruction as to the limited purpose for which the evidence is being introduced.'" *State v. Brown,* 626 A.2d 228, 233 (R.I.1993) (quoting *State v. Chartier,* 619 A.2d 1119, 1123 (R.I. 1993)).

Even if "other crimes" evidence clears the Rule 404(b) hurdle, it may still be excluded if it does not survive scrutiny under Rule 403 of the Rhode Island Rules of Evidence, which provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Under Rule 403, we have said that the discretion to exclude evidence must be used sparingly. *Wells v. Uvex Winter Optical, Inc.,* 635 A.2d 1188, 1193 (R.I.1994). It is when evidence is marginally relevant and enormously prejudicial that a trial justice must exclude it. *State v. Silvia,* 898 A.2d 707, 717 (R.I.2006) (citing *Wells,* 635 A.2d at 1193). It is upon the completion of these twin analyses that a defendants Sixth Amendment constitutional right to a fair trial by an impartial jury may be safeguarded, and it is to this inquiry that we now turn.

### A. Pona's Pager and Fingerprints

We begin by noting that the trial justice below did not engage in the careful weighing that is required when admitting evidence under Rule 404(b). *See Brown,* 900 A.2d at 1160. After considering the probative value of this evidence, we disagree with the state that the pager and fingerprints were sufficiently relevant to show Pona's motive to kill Jennifer. Rather, in our opinion, defendant had a motive to kill Jennifer because she had testified against him at his bail hearing, and he knew she was scheduled to testify against him at a trial in which he faced potential life imprisonment. Apart from the motive issue, the specific facts of the murder of Hector Feliciano have little, if any, probative value with respect to any conspiracy surrounding Jennifer's murder, except perhaps to demonstrate that defendant was prone to kill. *See State v. Jenkins,* 178 N.J. 347, 840 A.2d 242, 253–54 (2004).[13]

---

13. With respect to the state's argument that Fullen and Perez mentioned the pager and fingerprints during their testimony about their conversations with Pona, our review of the record reflects that those references were fleeting and insignificant. The overwhelming substance of their testimony concerns Pona's expressions and desires to be rid of Jennifer

In *Gallagher*, 654 A.2d at 1207, the defendant was charged with robbery and kidnapping. During trial, Kenneth, a defense witness and friend of the defendant, testified that the defendant was with a group of friends, after they had finished a game of basketball, when several police officers detained them. *Id.* at 1209. On cross-examination, the prosecution asked Kenneth several questions about the shooting of a Navy man in Newport, and whether he knew if that was why the police had stopped them. *Id.* Later, during the testimony of a rebuttal witness for the state, the arresting police officer explained that he stopped the defendant and his friends on that night because they did not have a front license plate displayed on their car. *Id.* He then continued to testify that he also stopped Kenneth at a later time because the police had information that there was going to be a possible shooting of a military person. *Id.* The state argued that the evidence was offered to prove that Kenneth was confusing two separate events and that the defendant was not present when the police searched Kenneth for a gun. *Id.* at 1210. This Court held that the evidence, implying that the defendant and his friends were suspects in the shooting of the Navy man, was irrelevant and sufficiently prejudicial to constitute reversible error.

In *Gallagher*, this Court reversed precisely because we could not allow the jury to find "a defendant guilty based upon unrelated crimes rather than upon the evidence pertaining to the charged offense." *Gallagher*, 654 A.2d at 1211 (quoting *State v. Cardoza*, 465 A.2d 200, 202 (R.I.1983)). Here, the specific admission of the evidence about the pager and fingerprints was confusing and unnecessary because it placed before the jury the facts of a wholly

different murder, to say nothing of its enormously prejudicial impact.

◾ The main issue at Pona's trial was whether he conspired with his half brother to kill Jennifer for defendant's benefit. The trial justice ruled that any reference to Pona's conviction for murder would be excluded, yet he allowed the state to introduce evidence that would lead the jury to the inevitable conclusion that he also killed Feliciano. This evidence had little probative value with respect to defendant's motive to eliminate Jennifer and it did much more to confuse the issues before the jury.

"If evidence of other crimes is admitted, all that is necessary to show prejudice is a reasonable possibility that the improper evidence contributed to a defendant's conviction. * * * Furthermore, this [C]ourt has held that 'if we are unable to say whether the jury would have reached the same verdict if the evidence had not been improperly admitted, we will enter a finding of reversible error.'" *Gallagher*, 654 A.2d at 1211 (quoting *State v. Burke*, 427 A.2d 1302, 1304 (R.I. 1981)).

◾ Once the jurors were burdened with the damning evidence from the Feliciano murder, there was a substantial risk that they would conclude they were dealing with a defendant who had murdered before and who was prone to do so again. We do not agree that the pager and fingerprint evidence is probative enough to demonstrate motive. Rather, the relevancy of the pager and fingerprints was remote and the relationship to Jennifer's murder remained tenuous.

Furthermore, we are of the opinion that this evidence essentially proved that Pona was the murderer of another teenager and was extremely prejudicial. Therefore, this highly prejudicial "other crimes" evidence

to improve his prospects of avoiding a convic-

tion for killing Feliciano.

should have been excluded from trial.[14] We conclude that this error was far from harmless, and that it denied defendant a right to a fair trial on the charge for which he was on trial.

## B. The Bail–Hearing Testimony

■ Before trial, defendant objected to the introduction of Jennifer's bail-hearing testimony citing *Old Chief v. United States*, 519 U.S. 172, 174, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997). In that case, the United States Supreme Court held that the nature of a defendant's previous conviction (as distinguished from the simple fact of that conviction) was not admissible to show the prior-felony-conviction element of the offense of possession of a firearm by a felon. *Id.* Pona argued to the trial justice that the admission of a tape recording of Jennifer's bail-hearing testimony relating to the Feliciano murder charge was both unnecessary and overly prejudicial, especially in light of defendant's offer to stipulate that Jennifer was the prime witness for the prosecution in an upcoming trial. Indeed, the trial justice initially inquired as to why it was necessary for the jury to view the entire transcript, but then he eventually admitted the entire audiotape recording, as well as the complete transcript, over defendant's objection, reasoning that the testimony went directly to Pona's motive to kill Jennifer.

Pona argues that this case bears remarkable similarity to *Jenkins*, 840 A.2d at 246, in which the Supreme Court of New Jersey held that a new trial was required because of the combination of the improper admission of videotape of the victim's prior testimony against the defendant in an earlier prosecution and additional "other crimes" evidence concerning the defendant. In *Jenkins*, the defendant and his friends were sitting on the porch of an apartment complex when the victim, Arthur Thomas, approached the group seeking to buy some drugs. *Id.* After completing the transaction, Thomas began to walk away, at which point the defendant recognized him as the man who had testified against him when he was on trial for another murder. *Id.* Although the defendant was acquitted in that case, he apparently still bore a grudge against Thomas. *Id.* The defendant picked up a brick and slammed it into the back of Thomas' head, causing him to fall down a flight of stairs and land on the concrete below, head-first. *Id.* Thomas died from skull and brain injuries resulting from his fall. *Id.*

At trial, the prosecution presented evidence indicating that the defendant attacked Thomas in retaliation for his testimony against the defendant. *Jenkins*, 840 A.2d at 247. That evidence included a detective's testimony that in an earlier case the victim had seen the defendant with a gun and had identified the defendant as the killer from a photographic array. *Id.* The prosecution then presented an excerpted videotape recording of Thomas' testimony from the first trial. *Id.* The Appellate Division vacated the defendant's conviction, concluding that "the cumulative effect of the multitude of other crimes evidence admitted at trial without clear and complete limiting instructions deprived defendant of a fair trial." *Id.* at 252 (quoting *State v. Jenkins*, 356 N.J.Super. 413, 812 A.2d 1143, 1153 (App.Div. 2003)). The New Jersey Supreme Court agreed, and it also held that the trial court erred when it admitted the videotape as well. *Id.* at 253. The Court reasoned that

---

14. We note that it is undisputed that Walker killed Jennifer for the sole reason of preventing her from testifying against defendant. The prosecutor is not prevented from presenting facts in his case-in-chief that are undisputed, including how Jennifer became involved in the first case and the gruesome manner of her death.

"the critical question concerns the extent and character of the evidence that the trial court should have allowed to demonstrate motive in these circumstances." *Id.* "More important, less prejudicial evidence exist[ed] to prove motive in these circumstances." *Id.*

In our opinion, this holding parallels our own jurisprudence requiring close scrutiny of the manner in which "other crimes" evidence is presented to the jury and how witnesses are questioned about the details of prior bad acts of a defendant. It is an old adage that the devil is in the details, and here, references to the murder of Feliciano should have been kept to a minimum. *See Brown,* 900 A.2d at 1163, 1164. We feel constrained to repeat that "[i]n this sensitive area of the law, the trial court can do much to strike a proper balance[ ] * * * between the prosecution's right to present necessary and relevant evidence and the accused's right to have his guilt or innocence determined by an impartial jury, free from the disruptive influences which accompany irrelevant, prejudicial, and extraneous evidence." *Jalette,* 119 R.I. at 627, 382 A.2d at 533–34.

Whether Pona was involved in Jennifer's murder, there is no question that her testimony at Pona's bail hearing, and the fact that she was to testify when he was tried for murdering Feliciano, led to her being killed. It was at the bail hearing that defendant and his comrades learned of her existence, where she lived, what she looked like, and what she witnessed after Feliciano was shot. We agree that reference to her testimony was reasonable to demonstrate the event that precipitated her tragic death. However, the Superior Court erred when it did not attempt to strike a balance between the necessity of admission and the danger of unfair prejudice occasioned by the wholesale adoption of the bail-hearing testimony. This type of evidence must be received "with great caution," and a careful review of her testimony reveals that there are particular statements that should have been excluded.[15] *State v. Peters,* 86 R.I. 447, 450, 136 A.2d 620, 621 (1957). Although we will not go so far as to deny the prosecution the opportunity to make any reference to the fact that defendant was charged with murder, we nonetheless hold that the quantum of evidence admitted here was extremely prejudicial to defendant and requires reversal.[16]

15. Although we do not attempt an exhaustive review of Jennifer's bail-hearing testimony on appeal, it is clear that during the pretrial hearing the prosecutor argued that her testimony was far less damaging because she did not witness Pona actually murder Feliciano. Yet, throughout Jennifer's testimony there are direct references to the fact that Pona was Feliciano's murderer, making it no less damaging than if she actually had witnessed the first murder in its entirety. For example:

"Q. And you knew that they were looking for someone that allegedly killed Hector Feliciano, right?
"A. Yeah.
" * * *
"Q. Did they tell you why they wanted you to pick out a photograph?
"A. Cause they wanted to get the guy.
"Q. That the guy that what?

"A. That killed Hector.
" * * *
"Q. Now, you know that Mr. Pona is being charged with murder, right?
"A. Yes.
"Q. And you know that if you identify him as the person running from a lot where a shooting just took place, he has got some problems. You know that, right?
"A. I know that."

16. We note that the Superior Court did not attempt to weigh the tape's probative value against the danger of unfair prejudice under Rule 403 of the Rhode Island Rules of Evidence. By allowing hours of testimony from a teenage "voice from the grave," without engaging in the exercise of comparing its prejudice with its probative value, the Court failed to strike a balance that would allow the

### C. The Testimony Regarding Cocaine Use

 As mentioned above, defendant unsuccessfully moved for a mistrial after Dennis Fullen unexpectedly exclaimed on cross examination that he frequently engaged in the illegal drug trade with defendant. We are satisfied that the trial justice erred when he failed to grant the motion for mistrial, given the gravity of the unanticipated testimony and especially in light of the woefully inadequate instruction imparted to the jury. It may well be that no curative instruction could have overcome the impact of the witness' statements. However, we are confident that the one given here was completely ineffectual. *See State v. Manfredi,* 118 R.I. 144, 149, 372 A.2d 975, 977 (1977) (holding that reversible error was committed when the Court could not determine that the instruction given by the trial justice was sufficient to remove the taint of the statement and such doubt was to be resolved in favor of the defendant); *see also State v. Costa,* 111 R.I. 602, 609–10, 306 A.2d 36, 40 (1973) (stating that "there remains for the appellate court the question of whether such instructions were adequate to have

state to present its case without depriving defendant of his right to a fair trial by an

disabused the jury's mind of the prejudicial effect of the objectionable evidence").

### III

### Conclusion

As we said at the outset of this opinion, the murder of Jennifer Rivera was especially repugnant; it was a profound affront to the basic norms of civilized society. Nonetheless, even those accused of despicable acts are entitled to a fair trial. In this instance, we have concluded that the defendant did not receive a fair trial, and we are convinced that it is our responsibility to that same civilized society to reverse for a new trial.

Therefore, and for the reasons stated herein, we vacate the judgments of conviction. The record in this case shall be remanded to the Superior Court for a new trial.